UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

KYLE HARTRY,　　　　　　　　　　　　　　　　　　　08 CV 3725 (ADS)(ETB)

　　　　　　　　　　　Plaintiff,　　　　　　　　　　**DECLARATION OF**
　　　　-against-　　　　　　　　　　　　　　　　**JON L. NORINSBERG, ESQ.**

COUNTY OF SUFFOLK, SGT. "JOHN" LUNQUIST,
Individually and in his Official Capacity,  DET. VINCE
DALY, Individually and in his Official Capacity and C.O.
"JOHN DOE" and C.O. "JANE DOE"#1-10, Individually and
in their Official Capacities, (the name John Doe being
fictitious, as the true names are presently unknown),

　　　　　　　　　　　Defendants.
-------------------------------------------------------------------------X

　　　　**JON L. NORINSBERG**, declares pursuant to 28 U.S.C. §1746, under penalty of perjury,

that the following is true and correct:

　　　　1.　　　I am the attorney of record for plaintiff Kyle Hartry.   As such, I am familiar with the

facts stated below and submit this Declaration to place on the record the relevant documents in support

of plaintiff's opposition to defendants' motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.

　　　　2.　　　Attached as **Exhibit A** is a copy of the relevant portions of plaintiff Kyle Hartry's

deposition transcript.

　　　　3.　　　Attached as **Exhibit B** is a copy of the relevant portions of Sgt. Steven Lunquist's

deposition transcript.

　　　　4.　　　Attached as **Exhibit C** is a copy of the Interview of Sgt. Steven Lunquist by the Long

Island Press.

　　　　5.　　　Attached as **Exhibit D** is a copy of the S ubstitute Jail Order authorizing plaintiff's

transfer to the Nassau County Corrections Facility.

6.     Attached as **Exhibit E** is a copy of the form prepared by Investigator McCarrick dated September 19, 2007, placing plaintiff into protective custody.

7.     Attached as **Exhibit F** is a copy of the Suffolk County Correctional Facility Housing Notification.

8.     Attached as **Exhibit G** is a copy of the relevant portions of P.O. Victoria McCarrick's deposition transcript.

8.     Attached as **Exhibit H** is the photos of plaintiff following the attack.

9.     Attached as **Exhibit I** is a copy of the medical record authorizing plaintiff's transport to Peconic Bay Hospital.

Dated: New York, New York
       September 29, 2010

                              Respectfully submitted,


                              Jon L. Norinsberg (JN 2133)
                              Attorney for Plaintiff
                              225 Broadway Suite 2700
                              New York, N.Y. 10007
                              (212) 791-5396

**EXHIBIT A**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
KYLE HARTRY,

                              Plaintiff,


        v.          CASE NUMBER CV 08 3725


COUNTY OF SUFFOLK,
SGT. "JOHN" LUNQUIS, Individually,
and in his Official Capacity;
DET. VINCE DALY, Individually,
and in his Official Capacity;
and C.O. "JOHN DOE" and
C.O. "JANE DOE" #1-10, Individually,
and in their Official Capacities
(the name John Doe being fictitious,
As the true names are presently unknown),

                Defendants.
-------------------------------------------X
             DEPOSITION of KYLE HARTRY

                   MAY 6, 2010

                   11:30 A.M.

79

1                              K. HARTRY

2     A     Between when?

3     Q     The night of the stabbing --

4     A     April --

5     Q     -- and April 2006, did you speak to

6           the police at all about what you did

7           see during that period of time?  From

8           the night of the stabbing you talked

9           to the cops, you said you hadn't seen

10          anything.  After that night up until

11          April 2006, did you ever speak to them

12          again about the stabbing?

13                    MR. NORINSBERG:  Note

14                    my objection.  You can

15                    answer.

16    A     Yes.

17    Q     When was that?

18    A     A few -- couple of years later.

19    Q     If you know, were you incarcerated at

20          the time?

21    A     Yes.

22    Q     Do you remember where?  Were you in

23          local or Suffolk County, or were you

24          upstate?

25    A     I was -- I was in a precinct.

84
K. HARTRY

1
2          information relayed to the detectives?
3          Why did you do that?
4    A     I wanted my time cut.
5    Q     When you say your "time," you mean in
6          relation to your most recent arrest of
7          the assault and weapons case?
8    A     Yes.
9    Q     When you use the phrase, put that in
10         motion -- just, I know that may not be
11         appropriate.
12         When you spoke to your attorney --
13         actually was brought to the
14         detectives, had you been charged with
15         the drug charge yet?
16   A     Yes.
17   Q     Okay.  Okay.  So you had the assault
18         charge and the drug charge pending
19         when you made this effort to speak
20         with the detectives?
21   A     Yes.
22   Q     All right.  And you did that because
23         you wanted to get favorable treatment
24         in relation to those cases?
25   A     Yes.

1                          K. HARTRY

2          you know, then it would be

3          repercussions behind my actions.

4     Q    Do you remember the exact words he

5          used?

6     A    No.

7     Q    Okay.  Did there come a time after

8          that at that point that you received

9          any kind of actual threats from

10         anybody?

11    A    Yes.

12    Q    In relation to that, when did the

13         threats occur?

14    A    Later on that day.

15    Q    And what were the nature of the

16         threats?

17    A    The guy told me, "I'm waiting for the

18         statements.  When the statements come

19         out, you won't be able to live in this

20         jail," and it's like that.

21    Q    Was that a different guy than the

22         first guy?

23    A    A different guy.

24    Q    Do you know who that person was?

25    A    Yes.

104

1                              K. HARTRY

2     A     I can't remember exactly who I talked

3           to that day.  That day I don't

4           remember.

5     Q     After you explained to them what had

6           occurred, you said they moved you?

7     A     Yes.

8     Q     And where did they move you to?

9     A     To the pod which is on the other side

10          of Suffolk County Jail.

11    Q     Did the security person say anything

12          to you about moving you, or did they

13          just move you?

14    A     No.  She asked me -- like she said,

15          "Well, you want to move?"  I'm like,

16          "Yeah."

17    Q     You said "she."  It was a female?

18    A     Yes.  I think Ms. M.

19    Q     All right.  And were you moved to the

20          pods?

21    A     Yes.

22    Q     And what happened?  Actually, I should

23          ask you, from the time that you spoke

24          to the security personnel about what

25          had happened and they said that they

K. HARTRY

1

2          were moving you, how much time applied

3          before you actually moved?  Was it

4          several days?  Was it that day?  Do

5          you remember?

6     A    That same day.  That same night.

7     Q    What, if anything, happened when you

8          got moved to the pod?

9     A    I was over there in the pod.  The next

10         morning we went to yard, to the rec

11         pen.  We went there with some other

12         inmates from my tier.  They were in a

13         different yard right across from the

14         yard that I was in, and, you know, the

15         word spread like wildfire.  "Hey, he's

16         a snitch."

17    Q    You say other inmates from the tier.

18         "Tier," you mean the one from the one

19         you got moved?

20    A    Yes.  I was in the yard.  On the other

21         side of the yard -- we was in one

22         fenced-in yard, they was in the other

23         fenced-in yard, and were telling the

24         other inmates, "He's snitching."

25    Q    You said "other inmates."  Were they

109

1      K. HARTRY

2      "Well, we're going to have to sign him

3      into PC."

4   Q  Okay.  And do you know what that

5      meant, sign into PC?

6   A  Yes.

7   Q  What does that mean?

8   A  It means you sign a piece of a paper

9      saying I want to be in protective

10     custody.

11  Q  Do you know why you had to sign a

12     piece of paper to be in protective

13     custody?

14  A  It's voluntarily.  I mean, it's not

15     like it's involuntary.

16  Q  When you signed that piece of paper,

17     was there any type of instructions on

18     it indicating what protective custody

19     would mean?

20  A  I don't understand that.

21  Q  Did you actually sign into protective

22     custody?

23  A  Yes.

24  Q  You signed a piece of paper?

25  A  Yes.

1                              K. HARTRY

2       Q    After you did that, did you remain in

3            the pods?

4       A    No.

5       Q    You were moved to someplace else?

6       A    Yes.

7       Q    Do you know where it was that you were

8            moved to?

9       A    Protective custody.  I think that's

10           the second or third floor.  I can't

11           remember exactly.

12      Q    But you actually moved from the area

13           with the pods.  You were no longer

14           housed there.  You were housed in a

15           different area?

16      A    Right.

17      Q    And it's your belief that that was in

18           relation to you having signed into

19           protective custody?

20      A    Yes.

21      Q    And that area of the jail, do you know

22           where that was?

23      A    Yes.

24      Q    Do you know what tier it was, floor,

25           whatever?

113

1                              K. HARTRY

2                    You were in the tier, you were sent to

3                    the pod, then you were sent to the

4                    area you just described.  How long

5                    were you in the area of the pod?

6      A    In the pod, one day.

7      Q    And then you got sent to the area --

8           I'm sorry.

9      A    Like one night.

10     Q    Okay.  And then you got put into this

11                   area, this area of the jail where you

12                   were in the day area?

13     A    Yes.

14     Q    And what, if anything, happened while

15                   you were there?

16     A    I was sleeping in my bunk on a day

17                   area bed, and this inmate that was --

18                   he was in one of the cells, was

19                   throwing wet tissue at me.

20     Q    Okay.

21     A    And he was threatening me.  He was

22                   threatening me when I come out my

23                   cell.  You know, "I'm going to do this

24                   to you."  He was telling this other

25                   kid about a weapon or something.  He

114

1                               K. HARTRY

2            showed it to me, showed me some type

3            of weapon.

4      Q     When you say "he was threatening me,"

5            he said to come out of your cell?

6      A     I don't know exactly what he said, but

7            he was saying -- he was saying that --

8            he said, "I heard about you.  I know

9            what's good with you," meaning -- I

10           know what -- "I know that you

11           snitching on this woman," or whatever.

12           And he was like, "When I come out of

13           my cell, I'm going to get at you."

14     Q     Okay.  So he was in his cell, but you

15           were in the day area?

16     A     Yes.

17     Q     Were you in a bunk or something like

18           that?

19     A     Yes.

20     Q     Was your bunk close to where his cell

21           was?

22     A     Yes.

23     Q     And just for clarification, the day

24           area is an area that's in front of a

25           series of cells?  Is that fair to say?

117

1                          K. HARTRY

2        A    No.

3        Q    Okay.  You said this fellow that

4             threatened you in some fashion

5             mentioned something about a weapon?

6        A    Yes.

7        Q    Tell me about that.

8        A    He kept showing me some type of

9             weapon.

10       Q    Do you recall what that was?

11       A    I believe it was a sharpened spoon.

12       Q    When you say "sharpened spoon," do you

13            remember, was it like a metal spoon or

14            a plastic spoon?

15       A    Plastic spoon.

16       Q    And he showed it to you in some way?

17       A    Yes.

18       Q    When he showed it to you, did you say

19            anything?

20       A    He was like, "I heard about you.  When

21            I come out, I'm going to get at you."

22            I don't remember his exact words.

23       Q    Some threat in some way?

24       A    Yes.

25       Q    Did you say anything to him?

1                              K. HARTRY

2                    corrections officer about that.  You

3                    wanted to say more about that?

4         A          Right.  I wrote it on the piece of

5                    paper, "This guy has a shank," and I

6                    threw it out on the gallery where the

7                    officer is.  And the officer was like,

8                    "I just got in."  It was early in the

9                    morning, the shift just changed.

10        Q          Let me stop you.  Do you remember

11                   about what time it was?

12        A          No.  The shift just changed.

13        Q          I don't know.  I'm just asking if you

14                   know.  It's okay if you don't.

15        A          Maybe seven, maybe, I think.

16        Q          You just recall it being early in the

17                   morning?

18        A          Around that time.

19        Q          All right.  Tell me what happened.

20        A          And that's when he moved me out.  They

21                   came in and tossed up our stuff.

22        Q          And was there anybody else there,

23                   other than that officer, that came in

24                   to toss the stuff?

25        A          It wasn't that officer.  Some other

120

1                          K. HARTRY

2              officers came in and tossed it.  There

3              was a sergeant there, couple of

4              officers, one of the security guys

5              from security.

6         Q    Do you remember who that was from

7              security?

8         A    Jackson.

9         Q    A person named Jackson?

10        A    Yes.

11        Q    What happened after that, after they

12             did what you described?

13        A    They moved me.

14        Q    All right.  Do you know where they

15             moved you to?

16        A    Down to administrative segregation.

17        Q    Okay.  A different area of the jail?

18        A    Yes.

19        Q    Can you describe for me what that area

20             of the jail was like?

21        A    It's just like tiers, but it's on the

22             first floor.  It's just like the

23             tiers.

24        Q    Just at a different designation, only

25             different?

121

1                          K. HARTRY

2        A     Yes, first floor.

3        Q     From the time you left the pod until

4              the time you got to the area you

5              described as administrative

6              segregation, how much time went by?

7        A     I can't remember.  I know I was always

8              calling and trying to get out of the

9              prison, period.  I knew I couldn't

10             just go without being seen.  There's

11             no way.  It's not safe for me to be

12             anywhere in the jail.  I knew it.

13       Q     When you say you were "always

14             calling," who were you calling?

15       A     The security team at the jail.

16       Q     Again, there's phones in the pods and,

17             there's a phone in the day area where

18             you could do that?

19       A     Yes.

20       Q     I'm just asking.  I appreciate your

21             answer.

22             But you mentioned to me that you were

23             sent to the pod, and then you were

24             moved from the pods?

25       A     Yes.

122

K. HARTRY

2    Q    And then you went to the different

3         area where the guy threw paper at you?

4    A    Yes.

5    Q    And then you were moved to the

6         administrative segregation area.

7         I'm just asking, the area where you

8         were there to the area where this guy

9         was throwing the paper at you, do you

10        remember how long you were there for?

11   A    I don't recall exactly.  No.

12   Q    Okay.  And there came a time you said

13        you got moved to the administrative

14        segregation area --

15   A    Yes.

16   Q    -- after you were moved from the area

17        where the guy was throwing the paper

18        at you, correct?

19   A    Yes.

20   Q    When you got moved to the

21        administrative segregation area, what,

22        if anything, occurred at that time?

23   A    I was attacked.  In administrative

24        segregation, I was attacked by an

25        inmate.

124

1                              K. HARTRY

2        Q    Okay.  Okay.  From the time that you

3             got moved from the area where the guy

4             was throwing the paper at you -- I

5             just use that as a phrase because it's

6             easier to identify it that way.  From

7             the time that you got moved from that

8             area to October 24th of 2007 when this

9             guy attacked you, as you said, during

10            that period of time, did anybody say

11            anything to you or threaten you at all

12            during that period of time?

13       A    A couple of inmates asked me about

14            what, you know, they were hearing

15            around the jail or whatever.  Of

16            course I denied it.  I denied it all.

17            And then one day, I guess, this guy,

18            he didn't ask no questions.

19       Q    Okay.  We're going to get to him.  I'm

20            just asking about that period of time,

21            period of time when you got hit in the

22            area where the guy was throwing the

23            paper to the date when the guy, on

24            October 24, 2007, when you say the guy

25            attacked you, during that period of

```
 1                              K. HARTRY

 2              time, did anybody threaten you at all?

 3        A     No threats.  No.

 4        Q     Just those --

 5        A     Not really.

 6        Q     Just the conversations that you

 7              described about guys asking you if

 8              it's true, that type thing?

 9        A     Yes.

10        Q     And you denied it?

11        A     Right.

12        Q     Okay.  During the period of time that

13              you were in that area called

14              administrative segregation, where were

15              you specifically assigned?  Do you

16              recall?

17        A     I was in the day area.

18        Q     Was there a time during that period of

19              time that you were actually put into a

20              cell?

21        A     Where?  In --

22        Q     In administrative segregation.

23        A     I would think I was -- I believe I was

24              in a cell.  Yeah, something was wrong

25              with the cell.  It was something.
```

132

1                          K. HARTRY

2              more than the person in the cell,

3              correct?

4       A      Right.

5       Q      You mentioned to me that on October

6              24, 2007, something happened, correct?

7       A      Yes.

8       Q      Okay.  Tell me what happened on

9              October 24, 2007.

10      A      I was doing something at my bunk in

11             the day area, and some inmate was

12             behind me, talking about "You snitch,

13             you a rat," something of that nature.

14             He tapped me on the shoulder.  When I

15             turned around, he hit me in the face

16             with something.

17      Q      Let me stop you.  When this person was

18             talking, was he talking to anybody in

19             particular?

20      A      He was talking to me.

21      Q      Were there other persons around there?

22      A      There's other people in the day area.

23      Q      Okay.  At that time, do you recall if

24             there were other inmates in the day

25             area?

1                                    133
                          K. HARTRY

2       A    Yes.

3       Q    And when he's saying those words, was

4            he speaking -- I know you say he was

5            talking to you, but was there another

6            inmate there that he was having a

7            conversation with, or was he directing

8            that to you?

9       A    He was directing it to me.

10      Q    Where specifically were you?

11      A    Where what?

12      Q    Were you.  Were you on your bunk?

13      A    I was at my bunk.  I was standing over

14           my bunk, doing something.

15      Q    Okay.  And this person in some fashion

16           was behind you?

17      A    Yes.

18      Q    And you heard him saying words about

19           you being a snitch?

20      A    Yes.

21      Q    Do you know if he was screaming or

22           yelling?

23      A    He was like, "I hate rats.  You be

24           snitching, and I can't be around

25           snitches and rats."  And as soon as he

135

1                              K. HARTRY

2        Q     And is it fair to say that he did this

3              without warning?  He didn't give you

4              any warning that he was going to hit

5              you?

6        A     No.  He just saying something about,

7              you know, "snitch."

8        Q     Okay.

9        A     I wasn't quick enough to turn around

10             and see, you know.  He was coming at

11             me like --

12       Q     Okay.  It was right after he tapped on

13             your shoulder?  You turned, and that's

14             when you got hit?

15       A     Yes.

16       Q     Tell me what happened after you got

17             hit.

18       A     I was dazed and I fell on the floor.

19             As a matter of fact, he flipped me and

20             I fell because I was dazed.  You know

21             what I mean?

22       Q     Let me stop you.  When you got hit

23             with this object, where on your person

24             did you get hit?

25       A     On my face.

136

1                                  K. HARTRY

2        Q    Any particular spot?

3        A    Yes, under my eye, right in my eye, my

4             left eye (indicating).

5        Q    Okay.  Indicating -- the witness is

6             indicating his left eye with his left

7             hand.

8             You said then you went down to the

9             ground?

10       A    He flipped me.  Once he seen that I

11            was dazed, I couldn't defend myself,

12            he flipped me.

13       Q    When you say "flipped" you, could you

14            just describe that any more for me?

15       A    He stuck his leg out behind me, behind

16            my legs, put one of his arms in front

17            of my chest, and flipped me.

18       Q    Did you go to the ground?

19       A    Yes.

20       Q    What happened when you got on the

21            ground?

22       A    He kept punching me.

23       Q    And what was he doing?

24       A    He was punching me, kept punching me

25            in my face.

144

1                              K. HARTRY

2                      you spoke to Detective Daly on the

3                      telephone?

4                              MR. NORINSBERG:   Note

5                              my objection.

6          A     Yes, I talked to him on the telephone.

7          Q     When you spoke to Detective Daly on

8                the telephone, you told him about your

9                concerns; he indicated to you that

10               they would try to get you moved?

11         A     Yes.

12         Q     And during that same period of time,

13               from the period of time that people

14               learned that you were a witness to the

15               period of time to October 24, 2007,

16               during that same period of time, did

17               you have any conversations with

18               Sergeant Lunquis?

19         A     Yes.

20         Q     About how many times did you speak to

21               Sergeant Lunquis?

22         A     Ten, 20 times approximately.

23         Q     Were they all in person, or on the

24               phone, or a little bit of both?

25         A     Most of them were on the telephone,

1                          K. HARTRY

2              over the phone.

3    Q    Okay.  About how many times did you

4         call him on the telephone?

5    A    I'm not sure.  I'm not sure.  Ten,

6         approximately 15 times.

7    Q    Okay.  And if I could just use this.

8         From the time that the guy threw the

9         paper at you, from that period of time

10        until October 24, 2007, about how many

11        times have you spoken to Sergeant

12        Lunquis?

13   A    I can't -- I'm summing it all up from

14        the time.

15   Q    I understand.

16   A    I'm not sure.  I can't remember how

17        many times I called him after that

18        specific incident.  I don't know.

19   Q    When you spoke to him, what, if

20        anything, did you say to him?

21   A    I was telling him, you know, that my

22        life is in danger, that I need to be

23        moved, and what's going on with me

24        being moved out of jail.

25   Q    Okay.  What, if anything, did Sergeant

146

K. HARTRY

1

2          Lunquis say to you?

3   A   He said that he was going to get to

4          it.  He was going to get me moved or

5          whatever.  He kept telling me that

6          every time, and it never happened.

7   Q   When he said he was "going to get to

8          it," did he ever specifically say to

9          you that he was going to move you to

10         Nassau County Jail?

11  A   Yes.

12  Q   He used those words, "I'm going to

13        move you"?  "We're going to move you,

14        we're going to get to it, we're going

15        to move you to Nassau Jail"?

16  A   Yes.  "We're going to get to Nassau."

17        That's what he said.

18  Q   And this was before October 24th of

19        2007?

20  A   Yes.

21  Q   And as far as on October 24, 2007, do

22        you know the name of this guy that

23        punched you?

24  A   Before then?

25  Q   No.  No, now.  As you're sitting here

147

1                          K. HARTRY

2              now, do you know what his name is?

3      A       Yes.

4      Q       What's his name?

5      A       His name is Vincent Dalton.

6      Q       Okay.  And, to the best of your

7              knowledge -- I know you mentioned

8              Dalton said some things about not

9              liking snitches, not liking a rat,

10             things like that, correct, before he

11             hit you?

12     A       Yes.

13     Q       Other than that, did you have any

14             other information that would lead you

15             to believe how Dalton knew that you

16             were cooperating?  You follow my

17             question?

18     A       You know, it's prison.  If one person

19             knows, everybody knows.  It's just a

20             matter of time, and it doesn't take

21             that long.

22     Q       My question to you --

23     A       I don't know who specifically to know.

24             I don't know where he went.  Who

25             knows.  It was something always going

1                         K. HARTRY

2              be a witness that some people on a

3              tier said threatening things to you,

4              correct?

5      A       The first time this Brooks, the king

6              of the Bloods, the first thing he

7              said, "When I get those statements,

8              you cannot live in this jail."

9      Q       I appreciate that.

10     A       I told that to the security team.

11     Q       Right.  And the security team --

12     A       They did nothing.

13     Q       -- they moved you, correct?

14     A       They did nothing.  I remained in the

15             Suffolk County Jail.

16     Q       I understand you're saying they did

17             nothing.  The question I'm asking you

18             is:  When you made that complaint,

19             they moved you from that area of the

20             jail to a different area of the jail,

21             correct?

22     A       Yes.

23     Q       When you got to the different area of

24             the jail, there was other things that

25             happened, and that would be the pod,

178

1    K. HARTRY

2              Okay, John.  Ask your

3              questions.

4              EXAMINATION

5    BY MR. NORINSBERG:

6    Q   Was moving you from one area of the

7        jail to another area of the jail an

8        adequate response to your complaints,

9        as far as you're concerned?

10             MR. MITCHELL:  I

11             object.

12   A   Of course not.

13   Q   Why not?

14   A   Because you still -- you still -- you

15       still are in contact with people.  I

16       could still see people that were still

17       on the same tier with me.  I could go

18       sit on a visit; next to me is some guy

19       that just threatened me yesterday.

20       You know what I mean?  No.

21   Q   What measures would need to be taken

22       to protect your safety, as far as

23       you're concerned?

24             MR. MITCHELL:  Note my

25             objection.  You can

179

1                          K. HARTRY

2                          answer.

3        A      To be moved out of the jail.

4        Q      Did Sergeant Lunquis actually tell you

5               that you would be moved out of that

6               facility?

7        A      Yes.

8        Q      Now, you were given a ticket alleging

9               that you were in a fight with Dalton,

10              correct?

11       A      Yes.

12       Q      Were you, in fact, in a fight with

13              Dalton?

14       A      No.

15       Q      Did you ever punch Dalton?

16       A      No.

17       Q      Did you ever hit Dalton?

18       A      No.

19       Q      Did you ever strike Dalton in any way?

20       A      No.

21       Q      Did you kick Dalton?

22       A      No.

23       Q      Did you use any physical force against

24              Dalton?

25       A      No.

**EXHIBIT B**

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

3   --------------------------------------------X
    KYLE HARTRY,

4
                                    PLAINTIFF,

5
              -against-            Index No:

6                                 CV08-3725

7   COUNTY OF SUFFOLK, SGT. "JOHN" LUNQUIS,
    INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,

8   DET. VINCE DALY, INDIVIDUALLY AND IN HIS
    OFFICIAL CAPACITY & C.O., "JOHN DOE" & C.O.

9   "JANE DOE" #1-10 INDIVIDUALLY AND IN THEIR
    OFFICIAL CAPACITIES, (THE NAME JOHN DOE

10  BEING FICTITIOUS AS THE TRUE NAMES ARE
    PRESENTLY UNKNOWN),

11
                                    DEFENDANTS.

12  --------------------------------------------X

13
                      DATE:  MAY 7, 2010

14                    TIME:  11:10 A.M.

15

16

17              EXAMINATION BEFORE TRIAL of the

18  Defendant, STEVEN LUNDQUIST, s/h/a "John"

19  Linquis, taken by the Plaintiff, pursuant

20  to a Court Order, held at the Offices of

21  SUFFOLK COUNTY ATTORNEY, 100 Veterans

22  Memorial Boulevard, Hauppaupge, New York

23  11788, before a Notary Public of the State

24  of New York.

25

1                    LUNDQUIST

2          Q.    When you say interacting with

3    Kyle Hartry, what do you mean?

4          A.    Having conversations, passing

5    him in the corridor, involved in the

6    incident in the jail, I may have dealt with

7    him at that point.

8          Q.    Did you ever receive any phone

9    calls from Kyle Hartry while he was at the

10   facility?

11         A.    Yes.

12         Q.    How many phone calls in total

13   did you receive from Kyle Hartry?

14         A.    I don't know.

15         Q.    By the way, if I referred to

16   the jail as Riverhead, would you know what

17   I'm referring to?

18         A.    Yes.

19         Q.    Was it between 15 and 20 phone

20   calls?

21         A.    I don't recall the exact

22   amount.

23         Q.    Was it between 10 and 15 phone

24   calls?

25         A.    I don't recall the exact

1                    LUNDQUIST

2      number.

3          Q.    Was it between 25 and 30 phone

4      calls?

5          A.    I don't recall.

6          Q.    Can you give any approximation

7      at all as to how many phone calls that Mr.

8      Hartry made to you?

9              MR. MITCHELL:  Specify a time

10            between when and when.

11         Q.    In the fall of 2007, which I

12     will define right now for the purpose of

13     the deposition from the beginning of

14     September through the end of October 2007.

15     So during that time frame, how many phone

16     calls in total did you receive from Kyle

17     Hartry?

18         A.    Ten to 20.

19         Q.    What were those phone calls

20     about, to the best of your memory?

21         A.    Information on ongoing things

22     in the jail.

23         Q.    During those 10 to 20 phone

24     calls did Mr. Hartry ever express any

25     concerns to you about his safety in the

```
1                    LUNDQUIST
2    jail?
3         A.    Yes.
4         Q.    What type of concerns did Mr.
5    Hartry express to you?
6         A.    Concern of his safety.
7         Q.    What specifically did Mr.
8    Hartry tell you about his concern for his
9    own safety in the jail?
10        A.    I don't remember any specifics.
11        Q.    Can you tell us in sum and
12   substance what were the general complaints
13   or concerns that Mr. Hartry was expressing
14   to you during the phone calls?
15        A.    Basically that he was a
16   cooperating witness.
17        Q.    Did you have an understanding
18   of the terms cooperating witness?
19             MR. MITCHELL:  Object to the
20         form.  You can answer.
21        A.    Repeat the question?
22        Q.    What is your understanding of
23   what it means to be a cooperating witness?
24        A.    Someone who is cooperating with
25   the authority.
```

```
 1                      LUNDQUIST
 2          Q.    Is that also known as a
 3     confidential informant?
 4          A.    It could be.
 5          Q.    When did you first learn that
 6     Mr. Hartry was a cooperating witness?
 7          A.    I don't recall the date.
 8          Q.    Did you learn that Mr. Hartry
 9     was a cooperating witness at some point in
10     September of 2007?
11          A.    I don't recall the date.
12          Q.    Is it possible that you knew
13     that Mr. Hartry was a cooperating witness
14     within the first week of September 2007?
15              MR. MITCHELL:  Object to the
16          form.  You can answer.
17          A.    Repeat the question?
18          Q.    Is it possible that you knew
19     Mr. Hartry was acting as a cooperating
20     witness in the first week of 2007
21     September?
22          A.    Possible.
23          Q.    How did you first learn that
24     Mr. Hartry was acting as a cooperating
25     witness?
```

```
 1                      LUNDQUIST
 2         Q.    All questions in the deposition
 3    will relate to the fall of 2007 including
 4    September and October unless otherwise
 5    specified.
 6         A.    He asked that we look out for
 7    his safety.
 8         Q.    When Detective Daly asked that
 9    you look out for Kyle Hartry's safety, what
10    exactly did he tell you?
11         A.    That he was a cooperating
12    witness.
13         Q.    Did Detective Daly express any
14    concern about Kyle Hartry's safety?
15         A.    Yes, we had a conversation.  He
16    asked that we look out for him, Kyle.
17         Q.    What was your response to this
18    request?
19         A.    That we would look out for him.
20         Q.    Did Detective Daly tell you why
21    he had concerns about the safety of Kyle
22    Hartry?
23         A.    Yes, because he was a
24    cooperating witness.
25         Q.    In your experience, is a
```

LUNDQUIST

1

2      there and you were there, correct?

3          A.     Yes.

4          Q.     How long did the meeting last

5      between Detective Daly and Kyle Hartry on

6      September 20?

7          A.     I don't remember specifically.

8          Q.     Was it more than a half hour?

9          A.     Yes, I believe so.

10         Q.     Was it more than an hour?

11         A.     I'm not sure.

12         Q.     Was it some time between a half

13     hour and an hour?

14         A.     Yes.

15         Q.     What did Detective Daly discuss

16     with Kyle Hartry during that meeting?

17         A.     The meeting was between the two

18     of them.  I was just there, I didn't pay

19     attention to what they were talking about.

20         Q.     During the meeting on September

21     20, 2007, did Kyle Hartry ever express

22     concern to Detective Daly about his safety?

23         A.     I had a discussion with

24     Detective Daly about it, yes.

25         Q.     What did Detective Daly tell

LUNDQUIST

1

2   you about it during this meeting?

3        A.    That he was concerned for his

4   safety.

5        Q.    Detective Daly told this to you

6   in person during this meeting on September

7   20, 2007, correct?

8        A.    During the meeting with him and

9   Hartry?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Did Detective Daly tell you why

13   he was concerned about Kyle Hartry's

14   safety?

15       A.    Yes.

16       Q.    What did Detective Daly tell

17   you as to the reasons why he was concerned

18   about Kyle Hartry's safety?

19       A.    I don't remember any specifics.

20       Q.    In sum and substance, do you

21   remember the general concerns that

22   Detective Daly mentioned to you on

23   September 20, 2007?

24       A.    Could you repeat that, please?

25       Q.    You testified a moment ago you

28

```
1                        LUNDQUIST
2     don't remember the specific details of what
3     Detective Daly told you, about his concerns
4     regarding Kyle Hartry, correct?
5            A.      Correct.
6            Q.      Can you tell us generally what
7     were those concerns?
8            A.      That other inmates would know
9     that he was going to testify.
10           Q.      Did Detective Daly mention any
11    specific reasons why he was concerned that
12    other inmates might know about this?
13           A.      I don't understand the
14    question.
15           Q.      To your knowledge, did Kyle
16    Hartry make out a written statement
17    describing what he had witnessed on the
18    homicide?
19                   MR. MITCHELL:  Just as far as a
20             time, Jon, during the meeting between
21             Daly and Hartry or at any time?
22           Q.      To your knowledge, did Kyle
23    Hartry ever prepare a written statement
24    describing what he had observed with regard
25    to this homicide?
```

LUNDQUIST

1
2        A.     Did I ever see it?

3        Q.     To your knowledge, did Kyle

4    Hartry ever prepare a written statement

5    describing his knowledge of what happened

6    during this homicide?

7        A.     Did I believe that he wrote a

8    statement, that is what you are asking?

9                MR. MITCHELL:  Did you know, do

10            you know if Kyle Hartry wrote a

11            statement in relation to a homicide

12            he was a witness to, is that fair?

13        A.     Yes.

14        Q.     So you knew that Kyle Hartry

15    had, in fact, written a statement

16    describing the homicide, correct?

17        A.     The fact that he was a

18    cooperating witness lead me to believe he

19    had written a statement.

20        Q.     To your knowledge, was that

21    statement circulated amongst inmates at

22    Riverhead?

23        A.     I don't recall that.

24                MR. MITCHELL:  When you say you

25            don't recall that, are you saying it

```
 1                         LUNDQUIST
 2    time?
 3          A.     I don't recall seeing it.
 4          Q.     Did anybody ever tell you that
 5    Kyle Hartry had written a statement and
 6    that this statement had been circulated
 7    amongst inmates at Riverhead?
 8          A.     Did anybody ever tell me that?
 9          Q.     Yes.
10          A.     During that time period?
11          Q.     Yes.
12          A.     That, I don't remember.
13          Q.     If you had learned that Kyle
14    Hartry's statement had been circulated
15    amongst the inmates at Riverhead, would
16    that have raised any concern about his
17    safety in your mind?
18          A.     Yes.
19          Q.     Why would that have raised
20    concern about his safety?
21          A.     Because fear of retribution.
22          Q.     When you say retribution, can
23    you be more specific?
24          A.     He would or he could become a
25    target.
```

```
 1              LUNDQUIST
 2        Q.    Why would writing a statement
 3   out describing a homicide, why would that
 4   make Kyle Hartry a target at Riverhead?
 5              MR. MITCHELL:  I object to the
 6         form.  You can answer.
 7        A.    Because you are not suppose to
 8   testify against another inmate.
 9        Q.    Are you familiar with the term
10   snitch?
11        A.    Yes.
12        Q.    What does the term snitch mean?
13        A.    Somebody who tells on somebody
14   else.
15        Q.    In the content of context of
16   inmates at Riverhead, how are snitches
17   treated at that facility?
18              MR. MITCHELL:  By other
19         inmates?
20              MR. NORINSBERG:  Yes.
21        A.    I don't understand question.
22   How are they treated?
23        Q.    What safety concerns, if any,
24   would you have if Kyle Hartry was
25   identified as a snitch and this was known
```

34

1                          LUNDQUIST

2      protective custody?

3            A.     If it was a threat from other

4      inmates.

5            Q.     Did there come a time where you

6      learned that Kyle Hartry had, in fact, been

7      threatened by other inmates at Riverhead?

8            A.     Could you repeat that?

9            Q.     Did there come a time that you

10     learned that Kyle Hartry had, in fact, been

11     threatened by other inmates at Riverhead?

12           A.     When he got moved to protective

13     custody.

14           Q.     What did you learn at that

15     time?

16           A.     That he felt he was threatened.

17           Q.     During the 10 to 20 phone calls

18     that Kyle Hartry made to you in the fall of

19     2007, did he ever tell you that he had been

20     threatened by other inmates?

21           A.     He may have said he feared for

22     his safety.  He never made any specific

23     threat mentioned, any body specific.

24           Q.     It is your testimony today that

25     Kyle Hartry never made any specific

```
1                    LUNDQUIST
2    have any type of internal record keeping
3    for phone calls that are made from a
4    housing unit to security?
5         A.    We do now.  We didn't have that
6    in place at that time we are speaking of,
7    September of 2007.
8         Q.    Are you certain about that?
9         A.    Yes.
10         Q.    When was the new record keeping
11    system put in?
12         A.    I can't give you a specific
13    date.  It was after that.
14         Q.    Was it some time in the year
15    2007?
16         A.    I don't believe so.
17         Q.    Was it some time in the year
18    2008?
19         A.    I don't remember the exact
20    date.
21         Q.    After the 10 to 20 phone calls
22    that you received from Kyle Hartry, did you
23    ever make any type of report?
24         A.    No.
25         Q.    Did you ever make any type of
```

1                        LUNDQUIST

2      note or record relating to the phone calls

3      that you had with Kyle Hartry?

4          A.     No.

5          Q.     Why didn't you make any reports

6      after you received the phone calls from

7      Kyle Hartry?

8          A.     There was no need to make a

9      report.

10         Q.     If an inmate expressed concern

11     to you about his safety, are there any

12     circumstances in which you will generate a

13     report?

14         A.     If his status changed.  Changed

15     from general population to protective

16     custody there would have been a report

17     generated.

18         Q.     What type of report would be

19     generated if Mr. Hartry's status changed

20     from general population to protective

21     custody?

22         A.     Would have been a referral

23     written, called a three way.  Also would

24     have been a housing change administrative

25     segregation or PC form filed.  PC is

```
 1                    LUNDQUIST
 2   Hartry's safety after this fight?
 3        A.    Yes.
 4        Q.    What in your mind raised
 5   concerns about Kyle Hartry's safety after
 6   this fight?
 7        A.    That if he was, if he felt that
 8   he was unsafe, he will not be a good
 9   witness.
10        Q.    Why would he feel that he was
11   unsafe?
12        A.    'Cause he just been in a fight.
13        Q.    As far as your testimony is you
14   knew nothing about the circumstances of
15   that fight, correct?
16             MR. MITCHELL:  Object to the
17         form.  You can answer.
18        A.    Are we talking prior to the
19   fight or after the fight?
20        Q.    After the fight, did you learn
21   anything from Kyle Hartry about what had
22   happened?
23        A.    Yes, that he said that Dalton
24   had threatened him and they got into a
25   fight.
```

```
 1                     LUNDQUIST
 2          A.    He said that he punched him
 3    first.
 4          Q.    Did he say that he had punched
 5    him from behind?
 6          A.    I don't remember.
 7          Q.    Did you learn anything about
 8    the circumstances of how Mr. Dalton had
 9    punched Mr. Hartry?
10          A.    I don't understand your
11    question.  He punched him.
12          Q.    How did he punch him?
13          A.    With his fist.
14          Q.    Where?
15          A.    That, I don't remember.
16          Q.    Did you ask Mr. Hartry that?
17          A.    He had injuries to his face.  I
18    really didn't have to ask him.
19          Q.    Did you see any injuries on Mr.
20    Dalton?
21          A.    I don't remember.
22          Q.    Did you ever speak to Mr.
23    Dalton?
24          A.    Someone spoke to him.  I don't
25    remember if it was me or not.
```

1                    LUNDQUIST

2    might have been attacked by inmate Dalton?

3          A.    He said that Dalton had

4    initiated and thrown the first punch.

5          Q.    Did Kyle Hartry tell you

6    anything else that made you believe that

7    inmate Dalton had attacked him?

8          A.    He said that he was punched

9    first, so I mean semantics, he said Dalton

10   initiated the fight and Dalton punched him.

11         Q.    Did Mr. Hartry tell you

12   anything that lead you to believe that Mr.

13   Dalton had punched him because he was a

14   cooperating witness?

15         A.    Can you repeat that?

16         Q.    Did Mr. Hartry tell you

17   anything that lead you to believe that Mr.

18   Dalton had punched Mr. Hartry because Mr.

19   Hartry was a cooperating witness?

20         A.    Yes.

21         Q.    What did Mr. Hartry tell you

22   that lead you to believe that he had been

23   punched by Mr. Dalton because he was a

24   cooperating witness?

25         A.    He said that Dalton had said

```
 1                          LUNDQUIST
 2    something about him being a cooperating
 3    witness.
 4          Q.     What did Kyle Hartry tell you
 5    about this?
 6          A.     That he believes that Dalton
 7    had hit him because he was a cooperating
 8    witness.
 9          Q.     Did he give you any specific
10    word that Mr. Dalton had spoken that made
11    him think that?
12          A.     That, I don't remember.
13          Q.     What was your response, if any,
14    to Mr. Hartry's complaint?
15          A.     Remove him from the housing
16    area with Dalton.
17          Q.     Where did you move him to?
18          A.     I would have to look at the
19    record.  I believe we moved him to the
20    observation area.
21          Q.     What is the observation area?
22          A.     It is a small housing unit of
23    inmates that are constantly observed by the
24    officers.
25          Q.     When you say constantly
```

```
 1                    LUNDQUIST
 2   observed, do you mean 24 hours a day?
 3         A.    There is an officer there 24
 4   hours a day.
 5         Q.    Seven days a week?
 6         A.    Yes.
 7         Q.    Did there come a time where Mr.
 8   Hartry was placed in the observation unit?
 9         A.    I believe so, yes.
10         Q.    Was that in September of 2007?
11         A.    I will have to refer to the
12   record.
13         Q.    Was Mr. Hartry placed in the
14   observation unit before or after the
15   incident with Mr. Dalton?
16         A.    I have to look at the record.
17   I believe it was after.
18         Q.    Have you reviewed any record
19   before coming here today?
20         A.    Yes.
21         Q.    What record did you review?
22         A.    The record Mr. Mitchell has.
23         Q.    Can you describe the record you
24   looked at before your deposition?
25         A.    Housing sheet.
```

65

```
1                       LUNDQUIST
2         A.    No, because somebody else could
3    have been there in the meeting and he could
4    have talked to me later.  I don't remember
5    the exact circumstances.
6         Q.    Would it be fair to say that
7    Detective Daly requested that you attend
8    this meeting for the specific purpose of
9    discussing Kyle Hartry's safety at
10   Riverhead?
11        A.    No.
12        Q.    As it turned out you did, in
13   fact, you did discuss Kyle Hartry's safety
14   at this meeting, correct?
15        A.    Yes.
16        Q.    Are you familiar what is known
17   as a substitute jail order?
18        A.    Yes.
19        Q.    What is a substitute jail
20   order?
21        A.    You request to send an inmate
22   to another facility.
23        Q.    Under what circumstances is a
24   substitute jail order issued?
25        A.    Many different circumstances.
```

1                          LUNDQUIST

2          Q.    Can you give us an example of

3     some of the circumstances under which a

4     substitute jail order would be issue?

5          A.    It could be if a person is a

6     relative, has a relative that is a member

7     of the staff.  Could be if they are

8     involved in a crime against any of the

9     officers in the jail.  There is a lot of

10    reasons.

11         Q.    Have you used abbreviation SJO

12    for substitute jail order?

13         A.    Yes.

14         Q.    If I refer to it as SJO you

15    will know what I'm referring to?

16         A.    Yes.

17         Q.    To your knowledge, is an SJO

18    ever issued because there is a concern

19    about the safety of a particular inmate?

20         A.    Yes.

21         Q.    Under what circumstances would

22    a SJO be issued to protect an inmate?

23         A.    If we couldn't protect him in

24    Riverhead.

25         Q.    Can you give us an example of

68

```
 1                      LUNDQUIST
 2          A.    It could be.  It is on a case
 3     by case basis.
 4          Q.    Did, to your knowledge, did
 5     Kyle Hartry receive any death threats while
 6     he was at Riverhead?
 7          A.    No.
 8          Q.    If he had, in fact, received a
 9     death threat, would you have issued a SJO
10     based on the death threat?
11          A.    Case by case basis.  It would
12     have to be approved by my supervisor.
13          Q.    Who would be responsible for
14     initiating an SJO?
15          A.    Person that received the
16     information.
17          Q.    Can you describe the process
18     for getting an SJO?
19          A.    You have to, there is a form
20     you have to fill out.  It lists inmate
21     pediatrician agree, information,
22     circumstances why you want an SJO.  It is
23     passed up to the supervisor.
24          Q.    How long does it generally take
25     to fill out that form?
```

```
1                    LUNDQUIST
2         A.    Ten minutes.
3         Q.    How long does it generally take
4    to get an inmate transferred once an SJO
5    form is filled out?
6         A.    Depends.
7         Q.    What would be the usual time
8    frame for transferring an inmate once an
9    SJO form is filled out?
10        A.    That is to be approved by the
11   state.  You have to get permission from the
12   state, warden.
13        Q.    How long does that usually
14   take?
15        A.    Depends on the time of day, day
16   of week.
17        Q.    Would it be something that
18   could be done in one day?
19        A.    Yes.
20        Q.    In your experience that has
21   happened many times, correct?
22             MR. MITCHELL:  Object to the
23         form.  You can answer.
24        A.    Yes.
25        Q.    Did you ever discuss with
```

1                        LUNDQUIST

2    Detective Daly possibility of issuing an

3    SJO for Kyle Hartry?

4            A.     After the fight with Dalton.

5            Q.     At any time prior to the fight

6    with Dalton, did you ever discuss getting

7    an SJO for Kyle Hartry with Detective Daly?

8            A.     I don't remember.

9            Q.     At any time prior to the

10   incident with Mr. Dalton, did you ever

11   discuss with anybody at Riverhead the

12   possibility of getting an SJO for Kyle

13   Hartry?

14           A.     You mean another officer?

15           Q.     Any other employee at

16   Riverhead?

17           A.     No.

18           Q.     Did you consider trying to get

19   an SJO for Kyle Hartry at any time, before

20   the incident with Mr. Dalton?

21           A.     No.

22           Q.     Why didn't you consider getting

23   an SJO for Kyle Hartry before the incident

24   with Mr. Dalton?

25           A.     We had housing areas in the

72

```
 1                    LUNDQUIST
 2   document?
 3        A.    10/25/07.
 4        Q.    This would be after the
 5   incident with Mr. Dalton, correct?
 6        A.    Correct.
 7        Q.    In fact, you filled out this
 8   document the day after the incident with
 9   Mr. Dalton?
10        A.    I don't know the specific date
11   of the incident with Dalton.
12        Q.    To the best of your knowledge,
13   how much time past from the time of the
14   incident with Mr. Dalton to the time that
15   you filled out this SJO request?
16        A.    A day, maybe a day.  I don't
17   remember specifically.
18        Q.    I would like you to focus on
19   the section which says reason for request.
20   Do you see that?
21        A.    Justification.
22        Q.    Just directing to that box, do
23   you see the reason for request?
24        A.    Yes.
25        Q.    Then below that inside the box
```

1                    LUNDQUIST
2        Q.    So Mr. Hartry was going to give
3   testimony against another inmate in the
4   facility that he was at, correct?
5        A.    Yes.
6        Q.    Referring to the second line
7   where it says in part, quote this
8   information became well known throughout
9   the jail end quote.  What information were
10  you referring to?
11       A.    The fact that he had written a
12  statement.
13       Q.    So the fact Mr. Hartry had
14  written a statement had been well known
15  throughout the jail, correct?
16       A.    Yes.  That is what it says.
17       Q.    You wrote those words, correct?
18       A.    Um-hum.
19       Q.    You have to answer yes or no?
20       A.    Yes.
21       Q.    When you wrote those words you
22  were careful to be accurate, correct, sir?
23            MR. MITCHELL:  Object to the
24       form.  You can answer.
25       A.    Yes.

```
1                        LUNDQUIST
2          Q.    How did you know that the
3   information had been well known throughout
4   the jail?
5          A.    Through other inmates talking.
6          Q.    You heard from other inmates
7   talking that they knew something about Kyle
8   Hartry?
9          A.    Yes.
10         Q.    When did you first hear other
11  inmates talking about Kyle Hartry?
12         A.    I don't remember any specific
13  date.
14         Q.    Was it some time in September
15  of 2007?
16         A.    Yes.
17         Q.    Apart from hearing other
18  inmates talking about Kyle Hartry, was
19  there any other way that you knew that this
20  information had become well known
21  throughout the jail?
22         A.    Through Hartry himself.
23         Q.    What did Mr. Hartry tell you?
24         A.    That he had heard inmates
25  talking about him.
```

1                    LUNDQUIST

2        Q.    So you knew from Mr. Hartry

3   himself as well as from other inmates that

4   Mr. Hartry was known as a cooperating

5   witness, correct?

6        A.    Yes.

7        Q.    Referring to the next sentence

8   it says, quote Hartry has been labeled a

9   rat, end quote.  Do you see that, sir?

10       A.    Yes.

11       Q.    How did you know that Mr.

12  Hartry has been labeled a rat?

13       A.    Through other inmates and

14  through Hartry himself.

15       Q.    When did you first learn that

16  Mr. Hartry had been labeled a rat?

17       A.    I don't recall the date.

18       Q.    Some time in September of 2007?

19       A.    Yes.

20       Q.    Referring to the last part of

21  this sentence, it says Hartry has been

22  labeled a rat and has received threats, do

23  you see that, sir?

24       A.    Yes.

25       Q.    How did you know that Mr.

```
 1                    LUNDQUIST
 2  Hartry received threats?
 3          A.    From Hartry.
 4          Q.    Mr. Hartry told you he had
 5  received threats, is that correct?
 6          A.    Yes.
 7          Q.    When did Mr. Hartry tell you he
 8  had received threats from other inmates?
 9          A.    I don't remember the date.
10          Q.    Some time in September of 2007?
11          A.    I don't recall the date.
12          Q.    Was it during the 10 to 20
13  phone calls that you spoke with Mr. Hartry
14  about?
15          A.    I don't remember.
16          Q.    At some point you learned from
17  Mr. Hartry himself that he had received
18  threats from other inmates, correct?
19          A.    Yes.
20          Q.    Did you learn Mr. Hartry
21  received threats from other inmates at any
22  time prior to the incident involving Mr.
23  Dalton?
24          A.    Yes.
25          Q.    How much time past from the
```

1                          LUNDQUIST

2          A.    Ten, 15 minutes.

3          Q.    After you filled out this form,

4    what steps, if any, did you take with

5    regard to this SJO?

6          A.    Forwarded to Lieutenant

7    Hennesey.

8          Q.    Who is Lieutenant Hennesey?

9          A.    Commanding officer of the

10   record section.

11         Q.    Why did you forward the form to

12   Lieutenant Hennesey?

13         A.    Protocol.

14         Q.    What, if anything, did

15   Lieutenant Hennesey do with this form, to

16   your knowledge?

17         A.    He forwarded it to one of the

18   sergeants in the record area who contacted

19   the state, who contacted Nassau County.

20         Q.    All of this was done on October

21   25, 2007, correct?

22         A.    I believe so, yes.

23         Q.    Based on the SJO request you

24   filled out, was Kyle Hartry transferred to

25   the Nassau County Correctional Facility?

```
                        LUNDQUIST
1
2        A.    Yes.
3        Q.    At any time before October 25,
4    2007, did you ever consider preparing a
5    substitute jail order for Mr. Hartry?
6        A.    No.
7        Q.    At any time before October 25,
8    2007, did you ever consider making a
9    request for an SJO to transfer Mr. Hartry
10   to any other facility?
11       A.    No.
12       Q.    Why not?
13       A.    Because he was appropriately
14   housed in the jail.
15       Q.    When you say appropriately
16   housed, what do you mean?
17       A.    He was housed in an area where
18   he would be safe.
19       Q.    Would you agree that as it
20   turned out he was not housed in an area
21   that was safe?
22            MR. MITCHELL:  Object to the
23        form.  You can answer.
24       A.    Repeat that?
25       Q.    Would you agree as it turned
```

83

```
 1                    LUNDQUIST
 2        Q.    When you are over crowded you
 3   put inmates in a day area?
 4        A.    Yes.
 5        Q.    Are those inmates then in an
 6   open area?
 7        A.    It is not an open area.  There
 8   is a set of bars there.
 9        Q.    Relative to the other jail
10   cells there, are they in an open area where
11   they have free contact with each other?
12        A.    Yes.
13        Q.    Is there anything separating
14   one inmate from another inmate if both of
15   them are in a day area?
16        A.    No.
17        Q.    By the way, when I refer to day
18   bed, is it referred to as day area?
19        A.    Day beds are in the day area.
20        Q.    Did you investigate the
21   incident that took place between Mr. Hartry
22   and Mr. Dalton?
23        A.    I believe inmates were
24   interviewed.
25        Q.    To your knowledge, did you
```

LUNDQUIST

1

2     A.    Threat of physical harm, threat

3  to familiarity, threat to officers.

4     Q.    If an inmate made a threat to

5  Kyle Hartry, which he threatened to

6  physically harm Kyle Hartry, would that be

7  the basis for moving Kyle Hartry to another

8  facility?

9     A.    Not necessarily.

10     Q.    Under what circumstances would

11  that be a basis for moving an inmate to

12  another facility?

13     A.    If we felt we couldn't provide

14  a safe location for them.

15     Q.    What would be the determining

16  factor, if an inmate came to you and said

17  somebody just threaten to beat me up, what

18  would be the determining factor for you as

19  to whether or not that inmate should be

20  moved somewhere else?

21     A.    It would be the scope of the

22  threat.  If one inmate threaten another

23  inmate we are not moving them to another

24  jail.

25     Q.    How many inmates would have to

92

1          LUNDQUIST

2          threats would not be sufficient, I

3          don't believe that would be his

4          answer to the question.

5               MR. NORINSBERG:  We will go

6          back and ask him the question again.

7          Read back the record.

8               (Whereupon, the referred to

9          question and answer was read back by

10         the Reporter.)

11         Q.    Did you hear the question and

12     answer read?

13         A.    Yes.

14         Q.    Why is that not sufficient to

15     move Kyle Hartry to another facility?

16         A.    'Cause we have areas we can

17     move people where they will be safe.  We

18     have inmates with multiple number of

19     threats, it is an everyday occurrence.

20         Q.    You had indicated earlier that

21     the information had become well known

22     throughout the jail, correct?

23         A.    Yes.

24         Q.    So it wasn't just a few inmates

25     that knew about this, it was multiple

93

LUNDQUIST

1
2      inmates, correct?
3               MR. MITCHELL:  Object to the
4          form.  You can answer.
5          A.    Yes.
6          Q.    How many inmates would have to
7      know about Kyle Hartry cooperation before
8      you will consider moving him to another
9      facility?
10              MR. MITCHELL:  Object to the
11         form.  You can answer.
12         A.    Enough that we felt he was in
13     danger.
14         Q.    Until Kyle Hartry had the
15     incident with Mr. Dalton, you didn't feel
16     he was in any danger in your facility, is
17     that correct?
18         A.    We felt we housed him
19     appropriately.
20         Q.    Do you see where it indicates
21     inmate data on the top of SJO form in front
22     of you, Plaintiff's 1?
23         A.    Yes.
24         Q.    Abbreviation, AMWRIT, what does
25     that stand for?

96

1                    LUNDQUIST

2   you see that?

3        A.    Yes.

4        Q.    This process was initiated at

5   your request, correct?

6        A.    Correct.

7        Q.    If you had wanted to, could you

8   have made this request in September of

9   2007?

10              MR. MITCHELL:  Object to the

11          form.  You can answer.

12       A.    Yes.

13       Q.    If you want to, could you have

14   made this request in October of 2007 prior

15   to the incident with Mr. Dalton?

16              MR. MITCHELL:  Objection to the

17          form.  You can answer.

18       A.    Yes.

19       Q.    Approximately, how many SJO's

20   do you make in given year?

21       A.    Five to ten.

22       Q.    To your knowledge, how many

23   SJOs are requested overall by Riverhead

24   facility in a given year?

25       A.    I wouldn't know.  I don't know.

1                          LUNDQUIST

2    I just know what my unit does.

3          Q.      Personally, you would do five

4    to ten SJOs requests in a given year on

5    average, correct?

6          A.      Around there, yes.

7                  MR. NORINSBERG:  Mark

8          Plaintiff's 3, SJO form.

9                  (Whereupon, the aforementioned

10         SJO Form was marked as Plaintiff's

11         Exhibit 3 for identification as of

12         this date by the Reporter.)

13         Q.      Could you please take a look at

14   what has been marked as Plaintiff's 3?

15         A.      Okay.

16         Q.      Do you recognize this document?

17         A.      Yes.

18         Q.      What do you recognize this

19   document to be?

20         A.      It is an administrative

21   segregation form, mental health and

22   security referral.

23         Q.      When was this report prepared?

24         A.      September 19, 2007.

25         Q.      Was this report prepared

```
1                         LUNDQUIST
2    relating to Kyle Hartry?
3         A.    Yes.
4         Q.    Have you had a chance to read
5    this report?
6         A.    Just read it now.
7         Q.    Who prepared this report?
8         A.    Investigator McCarick.
9         Q.    Directing your attention to the
10   second line on this report, it says quote,
11   inmate wrote a statement on another inmate.
12   Copy of the statement has been passed
13   around the facility posing a threat to
14   inmate Hartry's safety, end quote.  Do you
15   see that?
16        A.    Yes.
17        Q.    According to this statement by
18   Investigator McCarick Mr. Hartry's
19   statement had been passed around the jail
20   facility, correct?
21        A.    According to this, yes.
22        Q.    Would you agree that if Mr.
23   Hartry's statement had, in fact, been
24   passed around the Riverhead facility that
25   would pose a threat to Mr. Hartry's safety?
```

99

1               LUNDQUIST

2     A.    Yes.

3     Q.    Why would that pose a threat to

4  Mr. Hartry's safety?

5     A.    Because it would show he wrote

6  a statement on another inmate.

7     Q.    That would indicate he was a

8  snitch, correct?

9         MR. MITCHELL:  Object to the

10      form.  You can answer.

11     A.    Yes.

12     Q.    Would you agree that a snitch

13  is the worst thing that you could be in

14  Riverhead?

15     A.    No.

16     Q.    Did you ever make a public

17  statement that a snitch is the worst thing

18  you could be at Riverhead?

19     A.    I don't recall.

20     Q.    Were you ever interviewed by

21  the Long Island Press?

22     A.    Yes.

23     Q.    Did you ever tell the reporter

24  from the Long Island Press that quote, the

25  worst thing you could be here is a snitch,

1                    LUNDQUIST

2     end quote?

3             MR. MITCHELL:  Objection.  Give

4        a time on that, when?

5     Q.     Question stands as is.

6             MR. MITCHELL:  I object to the

7        form of the question.  Re-ask the

8        question.

9             MR. NORINSBERG:  You have been

10        helpful, I don't have a problem.

11        This one I'm not asking about a day

12        yet, we are not there yet.

13             MR. MITCHELL:  I wanted to hear

14        the term ever, I didn't hear.  If you

15        did, that is fine.  I just asked her

16        to read it back.

17     Q.     Did you ever tell the reporter

18     from the Long Island Press that quote, the

19     worst thing you could be here is a snitch,

20     end quote?

21     A.     Yes.

22     Q.     What did you mean when you made

23     that statement to the reporter at the Long

24     Island Press?

25     A.     I would have to read that

LUNDQUIST

1

2   Q.   Did you see where it says

3   quote, the worst thing you could be here is

4   a snitch, end quote.  Do you see that?

5   A.   Yes.

6   Q.   Did you make that statement to

7   a reporter?

8        MR. MITCHELL:  Jon, I'm going

9        to object.  It is not the worst thing

10       to be here is a snitch, end quote.

11       The worst thing you have to be here

12       is a snitch, comma.  So we have to

13       protect people's identity.

14       MR. NORINSBERG:  I'm not asking

15       about the full sentence.  I'm asking

16       about the first clause, you are free

17       to do so.

18       MR. MITCHELL:  I didn't mean

19       that article says quote, you meant in

20       your question, end quote.

21       MR. NORINSBERG:  Yes.

22   Q.   Did you make the statement to

23   the reporter that quote, the worst thing

24   you could be here is a snitch, end quote?

25   A.   That is what it says here.  I

1                      LUNDQUIST

2         Q.    Did you ever receive a copy of

3    the report generated by Investigator

4    McCarick that you previously looked at and

5    which has been marked Plaintiff's 3?

6         A.    What is your question?

7         Q.    Did you ever receive a copy of

8    Plaintiff's 3?

9         A.    Prior to today?

10        Q.    Yes.

11        A.    It would be a copy in my

12   office.  Why?

13        Q.    So you were aware of what had

14   been written on Plaintiff's 3 on or about

15   September 19, 2007, correct?

16        A.    Yes.

17        Q.    In fact, Investigator McCarick

18   actually discussed this issue with you on

19   or about September 19, 2007, correct?

20        A.    Yes.

21        Q.    Investigator McCarick

22   specifically told you that Mr. Hartry's

23   statement had been passed around the

24   facility, correct?

25        A.    I don't recall that.

```
1                        LUNDQUIST
2          Q.    The form has a specific column
3     where it lists the reason?
4          A.    Yes.
5          Q.    According to this form Mr.
6     Hartry was moved from general population
7     into the Pods because of security, correct?
8          A.    Yes.
9          Q.    Then he was moved from the Pod
10    to two west south because of security,
11    correct?
12         A.    Yes.
13         Q.    Then he was moved again to two
14    west north because of security, correct?
15         A.    No.
16         Q.    So where it says security LC
17    change --
18         A.    No, you have to look at the
19    line above that.  He went from two west
20    south to two west north.
21         Q.    What, to your knowledge, was
22    the reason for that move?
23         A.    It is made by classification.
24    I don't know why they made that move.
25         Q.    As you sit here today, do you
```

128

1                          LUNDQUIST

2      the floor sergeant.  Problem on tier, I

3      believe that was the day he had the

4      altercation with Dalton.

5           Q.    You testified earlier that the

6      observation bay is kept under a constant

7      surveillance, is that correct?

8           A.    Yes.

9           Q.    So there are correction

10     officers assigned to monitor bay area 24

11     hours a day, 7 days a week, correct?

12          A.    Yes.

13          Q.    Would you agree the observation

14     area is one of the safest areas in the

15     prison?

16          A.    More segregated, yes.

17          Q.    Any area safer than the

18     observation bay?

19               MR. MITCHELL:  Object to the

20          form.  You can answer.

21          A.    Safer for inmates?

22          Q.    Yes.

23          A.    More segregated area.

24          Q.    Which would make it the safest

25     area for inmates, wouldn't it?

1                         LUNDQUIST

2          A.    Without looking at statistics

3    for different areas, it would be hard to

4    say that.

5          Q.    Did you ever consider moving

6    Kyle Hartry into the observation bay before

7    October 24, 2007?

8          A.    No.

9          Q.    Why didn't you consider moving

10   Kyle Hartry into the observation bay before

11   the incident with Mr. Dalton?

12         A.    He was living in that area for

13   a while and he didn't have any problems.

14         Q.    When you say he didn't have any

15   problems, how do you know that?

16         A.    He didn't report any problems.

17   The officer didn't tell us he was having

18   any problems.

19         Q.    Did you ever tell Mr. Hartry

20   that you were trying to move him out of the

21   jail?

22         A.    Only after he had the

23   altercation with Dalton.

24         Q.    At any time, before Mr. Hartry

25   had the altercation with Mr. Dalton, did

1                    LUNDQUIST

2    filled out an SJO that was denied?

3         A.    Not that I recall.

4         Q.    Do you know somebody by the

5    name of Mrs. C, who worked for security,

6    the letter C?

7         A.    No.

8         Q.    Can you think of anybody who

9    might have been working in security or at

10   the correctional facility with that letter

11   in their name?

12        A.    No.

13        Q.    Did Mr. Hartry ever tell you

14   that while he was in protective custody

15   another inmate had threatened him with a

16   sharp end spoon?

17        A.    Yes.

18        Q.    What did Mr. Hartry tell you

19   about that?

20        A.    That there was an inmate, he

21   was in a day area inmate, in a cell, that

22   he believed had a sharpened spoon and had

23   threatened him.

24        Q.    What action, if any, did you

25   take when Mr. Hartry made that complaint to

**EXHIBIT C**

- WEEKLY EDITIONS
- BEST OF LI
- About
    - Masthead
    - Contact
- ADVERTISE
- WEATHER

# Locked Up

## *Landing behind bars can make or break a gang banger*

*By Timothy Bolger on Sep 24th, 2009*



Recommend    Be the first of your friends to recommend this.

*Part 2 of our special series, Gangs of Long Island*

In early 2006, Melvin Daniels was a 20-year-old cocaine dealer for the Prospect Piru set of the Bloods in Westbury. The young man known as "Maniac" had seven years on the streets at that time, when an undercover narcotics detective with Nassau County police picked him up. After surviving what he describes as the "kill-or-be-killed" gang life, he began a three-and-a-half-year stay behind bars. He awaited trial in the relative comfort of Nassau County Jail surrounded by people from the community, then was convicted and sentenced to hard time in a medium-security upstate prison. Later, he was transferred to the maximum-security Elmira Correctional Facility after he slashed another inmate, a member of a rival gang, in the face and chest.

Once there, he traded up to the Hit Squad Brim set of the Bloods, a larger organization. But with tighter restrictions than before, and because his then-fellow inmates included cold-blooded killers with nothing to lose due to their much-longer sentences, he laid low and spent his time reading until his release earlier this year.

Out three months now, the barrel-chested 23-year-old took the microphone during the recent fifth-annual Roosevelt Community Awareness Day at Centennial Park and denounced the lifestyle that landed him a trip up the river.

"It's not a fun life, it's really not," said Daniels, now an anti-gang advocate with Help End Violence Now (HEVN), as a group of teenagers played in a basketball tournament before him. "You see who's really there for you, who keeps in contact," he said. Among the first things he did when he got out was tattoo his daughter's name, Madison, on his arm.

But Maniac was simply living up to the gang's expectation—that its members wind up dead, hospitalized or imprisoned. As he begins to pull his life back together, Daniels leaves behind a system that presently has ensnared more than 400 gang members—the number currently in the two county jails on Long Island, about 8 percent of the estimated more than 5,000 total gangsters on LI—and an untold number of local gang bangers who have been sentenced to the New York State prison system.

In recent tours of the Nassau County Jail in East Meadow and Suffolk County Jail in Riverhead, the *Press* got an up-close look at how gangs operate from inside.

**Strength in Numbers**

When a suspected gang member is arrested, they meet one of five specialized investigators in a holding pen at county jail where they're questioned, photographed and, depending on their answers, entered into a gang database.



Men on a Mission: Melvin Daniels (L.) and
Bishop J. Raymond Mackey outside Centennial
Park in Roosevelt where they spread their
message of peace on the streets through the
nonprofit group Help End Violence Now
(HEVN).

Whether or not they're awaiting trial or doing a "county bullet" (i.e., one year or less, the standard jail-term for misdemeanors—as opposed to felonies that earn longer sentences in an upstate prison), anyone who authorities believe might run with a gang gets investigated.

Suffolk County Jail officials said there were 238 gang members among the approximately 1,700 inmates as of Sept. 3. About half are 18 or younger and 30 to 40 percent are Bloods, although those estimates are constantly in flux. Nassau has 170 gang members identified in an inmate population of 1,653 as of Sept. 15—but in both jails there are exceptions.

"We have a lot more here than that, but we have to follow certain criteria," says Sgt. Steven Lundquist, commanding officer of the Gang Intelligence Unit, from inside his pale-green office adorned with confiscated gang paraphernalia. "We can't just recklessly label people gang members because it will affect their cases," and may add time on to their sentence, he says.

Knowing this, many suspected gang members lie to investigators about their affiliations and are less likely to have overt gang tattoos. A tactic used to avoid detection is to hide gang tats behind their ears, on the bottom of their feet, between their fingers, under their hair or inside their mouth. Gang-related burn marks and graffiti inside jail cells have also been curbed for those gang bangers trying to stay off the radar.

The best ways for jailhouse investigators to identify a gang member include self-admission, being fingered by a confidential informant, possessing a gang-rule list, or getting arrested with gang members, which at least makes them a suspected gang associate. Investigators can't peg the color of their clothing as a guarantee of gang membership—perhaps they just really like blue, the color identified with the Crips.

And in the case of a confidential informant, investigators have to be especially careful. "The worst thing you can be here is a snitch, so we have to protect people's identities," Lundquist says.

Once gang members are identified, they are spread out in separate housing areas and mixed in with rivals to avoid any one particular gang linking up and taking over a section. But no matter what cell block an inmate calls their new home, incarceration is often a transformative experience—for better or for worse.

Recommend this? [?]

Selected for you by a sponsor:
Anita Baker avoids jail in royalty dispute *(USATODAY.com)*

You might also like
Woman, 22, Killed in Old Westbury Crash *(Long Island Press)*
Westbury Man Arrested for Robbing Taxi Driver | Long Island Press *(Long Island Press)*
FDNY Captain from Westbury Arrested for Fake Vicodin Prescription | Long Island Press *(Long Island Press)*
2 Slashed, 4 Arrested in North Massapequa Brawl | Long Island Press *(Long Island Press)*

(Last updated on September 24, 2009 at 9:50 am) and filed under Featured, Gangs of Long Island, News, Special Series. You can follow any responses to this entry through RSS 2.0. You can leave a response or trackback to this entry

Pages: 1 2 3

Follow Timothy Bolger on Twitter!

Share / Save ⬡⬡ ▫ ▫

More articles filed under Featured, Gangs of Long Island, News, Special Series

## 2 Responses for "Locked Up"

1. *melvin daniels* says:
   February 22, 2010 at 12:24 am

**EXHIBIT D**

# COUNTY OF SUFFOLK

## CORRECTIONAL FACILITY
### SUBSTITUTE JAIL ORDER (SJO) REQUEST

### INMATE DATA

| NAME: Hartry, Kyle | PIN#: 340474 | DOB: 09/29/76 |
|---|---|---|
| SPECIAL INFO (MO, PC, ETC): None | CLASS: AMWRIT | LOC: 2WN32 |

### REASON FOR REQUEST

JUSTIFICATION: Inmate Hartry wrote statement against inmate Allen, Robin #194559. Inmate Hartry will be testifying against inmate Allen and this information become well known thruought the jail. Hartry has been labeled a rat and has received threats. This request was also made by ADA Albertson.

### FACILITY DATA

| SPECIFIC FACILITY REQUESTED? | ☐ YES | ☒ NO |
|---|---|---|
| IF YES, LIST FACILITY & REASON: | | |

### REQUESTED BY

| TITLE, NAME & SHIELD #: Sgt Inv Steven Lundquist #S167 | BUREAU: Gangs |
|---|---|
| SIGNATURE: Sgt Inv Steven ___ #S167 | DATE: 10/25/07 |

### ☒ APPROVED   ☐ DENIED   BY (WARDEN OR HIS/HER DESIGNEE)

| TITLE, NAME & SHIELD #: Lt. Thomas J. Hennessey L73 | BUREAU: Records |
|---|---|
| SIGNATURE: Lt. ___ L73 | DATE: 10/25/07 |

### RECORD ROOM DATA

| NAME OF SUBSTITUTE JAIL: Nassau County | STATE APPROVAL: ☒ YES ☐ NO |
|---|---|
| | Verbal Approval Per Marlene Johnson. |
| COMMENTS: | |
| PROCESSED BY: (TITLE, NAME & SHIELD#) Sgt Richard Fitzpatrick 877 | DATE: 10-25-07 |

**EXHIBIT E**

SUFFOLK COUNTY SHERIFF'S OFFICE
SUFFOLK COUNTY CORRECTIONAL FACILITY
ADMINISTRATIVE SEGREGATION REPORT FORM
MENTAL HEALTH & SECURITY REFERRAL

DATE OF REPORT: __9/19/07__     TIME OF REPORT: __1556__

NAME: __Haitiy, Kyle__     PIN #: __340474__

HOUSING LOCATION: __P32N 47__   DOB: __9/29/76__   CLASSIFICATION: __Minimum__

REASON FOR ADMINISTRATIVE SEGREGATION / MENTAL HEALTH REFERRAL / SECURITY REFERRAL:

Inmate is to be placed in P.C. per his own
safety. Inmate wrote a statement on
another Inmate. A copy of the statement has
been passed around the facility, posing
a threat to Inmate Haitiys Safety.

C/O Tim V.M._____ 344 SGT. _____ # _____ DUTY LT. __1110__ # __LN__

INITIAL ACTION: _____

_____ DATE: _____ ____ TIME: _____

CLASSIFICATION ACTION: _____

_____

_____

REFERRAL TO MENTAL HEALTH:   INFORMATIONAL [ ]   ROUTINE [ ]   URGENT [ ]

CLASSIFICATION OFFICER: _____ # _____ SUPERVISOR: _____ # __167__

DISTRIBUTION:
COPY  #1 WHITE     CLASSIFICATION
      #2 YELLOW    MENTAL HEALTH
      #3 PINK      SECURITY

DATE: __9/20/07__   APPROVED BY: _____   # _____

29-0433- 01/03

**EXHIBIT F**

**COUNTY OF SUFFOLK**



OFFICE OF THE SHERIFF

Vincent F. DeMarco
SHERIFF

## SUFFOLK COUNTY CORRECTIONAL FACILITY HOUSING NOTIFICATION

Hartry, Kyle _____ 340 474 _____ 9/19/07
NAME — PIN# — DATE

☐ **ADMINISTRATIVE SEGREGATION:** After reviewing your facility records and incarceration profile, it has been determined that by your actions you represent:

☐ An immediate danger to yourself, other inmates and/or facility staff.

☒ An immediate threat to your safety from other inmates.

☐ A clear threat to the safety, security and good order of the facility.

☐ And you will be placed in the Behavioral Management Unit.

☐ **REFUSE PROTECTIVE CUSTODY:** The classification unit has advised me that my safety can best be maintained by placement in protective custody. With full understanding of any risks I may be taking by opting for placement into general population, I am requesting to be moved from and/or not placed into protective custody. Clearly this request is made by me and not the Suffolk County Sheriff's Office or its employees. I further understand that by signing this release, I absolve the sheriff and his employees from any and all liabilities that may occur in general population housing. I also understand that if for any reason I feel threatened I will immediately notify the officer on duty and may request protective custody at any later time during my incarceration.

☒ **REQUEST PROTECTIVE CUSTODY:** I the undersigned inmate in protective custody understands that by signing this release, I absolve the Sheriff and any of his employees from any liabilities when going to any activities, programs or recreation. I also understand that if for any reason I feel threatened, I will not participate in any activities, programs or recreation and I will immediately notify the officer on duty.

☐ **MENTAL OBSERVATION HOUSING**

☐ **GENERAL POPULATION HOUSING**

_Kyle Hartry_
Inmates Signature

_C/Env. V. M Cauck 741 9/19/07_
Officers Signature — Shield #

**EXHIBIT G**

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ------------------------------------------X
    KYLE HARTRY,
4
                                    PLAINTIFF,
5
6          -against-           Case No:
                               3725 CV 08
7
    COUNTY OF SUFFOLK, SGT. "JOHN" LUNQUIST,
8   INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,
    DET. VINCE DALY, INDIVIDUALLY AND IN HIS
9   OFFICIAL CAPACITY AND C.O. "JOHN DOE" AND
    C.O. "JANE DOE" #1-10, INDIVIDUALLY AND IN
10  THEIR OFFICIAL CAPACITIES (THE NAME JOHN
    DOE BEING FICTITIOUS, AS THE TRUE NAMES ARE
11  PRESENTLY UNKNOWN),

12                             DEFENDANTS.
    ------------------------------------------X
13                   DATE:  June 3, 2010

14                   TIME:  11:10 a.m.

15

16

17          EXAMINATION BEFORE TRIAL of a

18  Witness for the Defendant County of

19  Suffolk, VICTORIA McCARRICK, taken by both

20  parties, pursuant to an Order, held at the

21  offices of Suffolk County Department of

22  Law, 100 Veterans Memorial Highway,

23  Hauppauge, New York 11788, before Joanne

24  Raimo, a Notary Public of the State of New

25  York.

1               McCARRICK

2    an inmate be placed in protective custody?

3         A.    You could be Court ordered

4    there.  There is many reasons why he would

5    be put into protective custody.

6         Q.    Did Mr. Hartry --

7         A.    There is individual reasons.

8    I'm sorry.

9         Q.    There is individual reasons?

10        A.    Each inmate has a reason why he

11   is there.  It may not be the same reason

12   for all inmates.  That's what I'm trying to

13   say.

14        Q.    What was the reason Mr. Hartry

15   was placed in protective custody?

16        A.    From reading this, it says that

17   he wrote a statement on another inmate and

18   the statement was passed around the

19   facility posing a threat to inmate Hartry's

20   safety.

21        Q.    To your knowledge, what type of

22   statement did Kyle Hartry write?

23        A.    I don't have any knowledge of

24   that.  I don't know.

25        Q.    How did you learn that this

```
 1                    McCARRICK
 2   Hartry with Sergeant Lunquist?
 3        A.    Yes.
 4        Q.    When did you first discuss Kyle
 5   Hartry with Sergeant Lunquist?
 6        A.    I would have notified him of
 7   this paper here after this.
 8        Q.    It would have been your normal
 9   custom and practice to notify Sergeant
10   Lunquist if you filled out a form such as
11   the one in front of you?
12             MR. MITCHELL:  I object to the
13        form.
14             But you can answer.
15        A.    Can you rephrase that?  I'm
16   really lost here.
17        Q.    Sure.
18        A.    Say that again.
19        Q.    You testified earlier that you
20   spoke to Sergeant Lunquist after you
21   prepared this form; is that correct?
22        A.    At some point, yes, I would
23   have spoken to him in a normal practice.
24        Q.    What would be the reason why
25   you would be speaking to Sergeant Lunquist?
```

1                    McCARRICK

2          Q.    Did Kyle Hartry ever tell you

3    that he had been attacked by other inmates

4    in the jail?

5          A.    I don't know if he did or he

6    didn't.

7          Q.    Directing your attention to

8    Plaintiff's Exhibit 1, you wrote, quote, "a

9    copy of the statement has been passed

10   around the facility posing a threat to

11   inmate Hartry's safety," end quote.  Do you

12   see that?

13         A.    Yes, I do.

14         Q.    How did you know that a copy of

15   the statement had been passed around the

16   facility?

17         A.    I don't know.

18         Q.    When you wrote that a copy of

19   the statement had been passed around the

20   facility, what was the basis of that

21   statement?

22         A.    From reading this form, I would

23   take that to mean that that was told to me,

24   but I don't know if that actually happened.

25   I don't know if it happened or it didn't.

1                     McCARRICK

2          Q.     Did you speak to anybody else

3     at Suffolk County Correctional Facility

4     regarding Kyle Hartry?

5          A.     I don't know if I did or I

6     didn't.

7          Q.     Did any other employee at the

8     Suffolk County Correctional Facility tell

9     you that a copy of the statement had been

10    passed around the jail facility?

11         A.     I don't know.

12         Q.     Is it possible that you

13    actually saw a copy of the statement that

14    Kyle Hartry had written?

15              MR. MITCHELL:  Objection to the

16         form.

17              But you can answer.

18         A.     I don't know if I did or did

19    not see anything pertaining to a statement.

20         Q.     Directing your attention to the

21    last part of your entry here it says,

22    quote, "posing a threat to inmate Hartry's

23    safety," end quote, do you see that?

24         A.     Yes, I do.

25         Q.     Did you believe that there was

1                    McCARRICK

2    of this form?

3           A.    Yes, it is.

4           Q.    Is Mr. Hartry's signature there

5    as well?

6           A.    Yes, it is.

7           Q.    On this form did you check out

8    any boxes or put an X in any boxes?

9           A.    The inmate would fill out and

10   check the box.  I would put an immediate

11   threat why and he was requesting protective

12   custody.

13          Q.    Did you fill out any of the

14   boxes on this form?

15          A.    I filled out an immediate

16   threat to your safety from others.  That's

17   the reason why he was requesting protective

18   custody or being placed into protective

19   custody.

20          Q.    You filled out the box that

21   said, quote, "an immediate threat to your

22   safety from other inmates," end quote?

23          A.    Yes.

24          Q.    Why did you fill out that box?

25          A.    Because that would be the

```
 1                        McCARRICK
 2    for their own safety?
 3            A.    Yes.  They could or they can't
 4    be.  They don't have to be there just for
 5    their own safety.  There is multiple
 6    reasons why someone is placed in
 7    administrative setting.
 8            Q.    Are you familiar with what is
 9    known as an SJO?
10            A.    Yes, I am.
11            Q.    What is an SJO?
12            A.    Substitute jail order.
13            Q.    What is that?
14            A.    That would be where we would
15    house an inmate in another facility outside
16    of our own.
17            Q.    Under what circumstances would
18    an SJO be issued?
19            A.    There's individual reasons
20    again why an SJO would be used.
21            Q.    Would an SJO be used for the
22    safety of an inmate?
23            A.    It can be, but it doesn't have
24    to be.
25            Q.    Did you consider requesting an
```

**EXHIBIT H**







**EXHIBIT I**

07-05196

COUNTY OF SUFFOLK



IFFICE OF THE SHERIFF

Vincent DeMarco,
Sheriff

## INMATE HOSPITAL TRANSPORT FORM

HARTRY, Kyle          340474      09-29-76     1E/N 0A03
INMATE'S NAME          PIN #       DATE OF BIRTH    HOUSING LOCATION

Chief Complaint    R/O   Orbital fracture  on  Left Side.

Robert Coely          798        Sgt Hunt Mongo      SITO
Correction Officer     Shield #      Supervisor          Shield #

Internal Security Notified: (Y) or N   Mark Smith      1433      10-24-07
                                    Investigator Notified    Time      Date

Transportation TO hospital:

P/s  Manewy 547                15/5          10-24-07
Means of Transportation          Time.          Date

.If the Inmate is sent to the hospital from anywhere other than Riverhead – Fax to Riverhead Duty Lt. (13591) after completing the above information

### Disposition to be completed by the Riverhead Duty Lieutenant

Admitted to Hospital       Y or (N)     _____      _____
                                        Time          Date

Transportation FROM hospital:

P/s  Manewy 547                1850         10-24-07
Means of Transportation          Time          Date

Medical Paper Work:     (Y) or N

Inmate Screened by Medical prior to re-housing: (Y) or N

C I.B Notified:          Y  or  N   _____    _____    _____
                                    Investigator Notified   Time      Date

Distribution after completion:
Original————Security
Copy————Facility Management
Copy————Classification
Copy————PRAT Commander
Copy————Jail Medical Director

100 CENTER DRIVE
RIVERHEAD, NEW YORK 11901-3389
(631)852-2200