**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
KYLE HARTRY,

        Plaintiff,

      -against-

COUNTY OF SUFFOLK and SGT. STEVEN
LUNDQUIST, individually and in his Official
Capacity, and C.O. "JOHN DOE" and C.O.
"JANE DOE"#1-10, Individually and in their
Official Capacities, (the name John Doe being
fictitious, as the true names are presently
unknown),

        Defendants.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
08-CV-3725 (ADS) (ETB)

**APPEARANCES:**

**Law Office of Jon L. Norinsberg**
*Attorney for the Plaintiff*
225 Broadway, Ste. 2700
New York, New York 10007
      By: John L. Norinsberg, Esq., Of Counsel

**Christine Malafi, Suffolk County Attorney**
*Attorney for the Defendants*
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Happauge, New York 11788
      By: Brian C. Mitchell, Esq., Assistant County Attorney

**SPATT, District Judge.**

      This action arises from personal injuries sustained by the plaintiff, Kyle Hartry ("Hartry"

or "Plaintiff"), during an attack by a fellow inmate that occurred on October 24, 2007 while the

Plaintiff was incarcerated at the Suffolk County Correctional Facility ("SCCF"). On September

12, 2008, the Plaintiff filed a complaint alleging that Sergeant Steven Lundquist ("Lundquist"),

Detective Vince Daly, and the municipal entity of Suffolk County failed to protect him from harm, and exhibited a deliberate indifference to his health, safety and welfare in violation of his Constitutional rights. The Plaintiff voluntarily dismissed the claims against Detective Daly. The remaining defendants, Lundquist and the County of Suffolk (together the "Defendants") move for summary judgment dismissing the complaint on the following grounds: (1) the Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act; (2) the complaint fails to state a claim under 42 USC § 1983; (3) Defendant Lundquist is entitled to qualified immunity; and (4) the complaint fails to state a negligence claim under New York state law. For the reasons set forth below, the Court denies the Defendants' motion in its entirety.

## I. BACKGROUND

The following facts are drawn from the parties' evidentiary submissions in this case. Because the Defendants' have brought this motion for summary judgment, any inferences that the Court draws from the facts as presented are viewed in the light most favorable to the Plaintiff.

In late 2006, while in the custody of the New York State Department of Corrections ("DOC"), Hartry contacted the Suffolk County Police Department and spoke with Detective Vincent Daly regarding information Hartry possessed about an open homicide case. In exchange for favorable treatment on his own pending criminal charges, Hartry agreed to testify against an inmate being held at the SCCF regarding that inmate's involvement in the open homicide case. On December 21, 2006, because the inmate's homicide prosecution was to take place in Suffolk County, Hartry was transferred from DOC to the SCCF. Hartry was housed at the SCCF for several months, during which time he prepared a statement for the prosecution. In September

2007, there was a discovery hearing in the prosecution of the inmate against whom Hartry was testifying. During that hearing, the inmate was provided with a copy of Hartry's statement implicating the inmate in the homicide.

Subsequently, on September 18, 2007, Hartry was approached by another inmate at SCCF who Hartry claims was a member of the Bloods gang, and was known as the "King of the Bloods." Hartry alleges that the "King of the Bloods" said to him, "I'm waiting for the statements. When the statements come out, you won't be able to live in this jail." (Hartry Dep. 100:17–20.) On that same day, Hartry informed a member of the SCCF Internal Security Unit (the "Security Unit") that his status as a witness had become known to other inmates in the general population, and that as a result he was being threatened. In response to that information, security immediately moved Hartry from the general population of SCCF to an area known as PODS that was located on the other side of SCCF.

The very next day, on September 19, while Hartry was outside in the recreation area of PODS, word of his status as a cooperating witness—commonly referred to in prison as a "snitch" or a "rat"—continued to spread. Although separated by a fence, the recreation area of PODS bordered the recreation area of the general population, and Hartry heard inmates from his former tier yelling about him through the fence, "Hey, he's a snitch. He's snitching." (Hartry Dep. 105:15–16, 24.) After that recreation period, while Hartry showered, another inmate stole Hartry's belongings from his cell.

Hartry again called the Security Unit and informed the officer on duty that his fellow inmates in PODS knew of his status as a witness and had taken all of his belongings. Hartry also told the security officer that a copy of the statement he had written in the homicide case was being passed around the jail. The officer brought Hartry to the Security Unit and suggested that

Hartry sign himself into protective custody if he felt unsafe. Hartry immediately signed the protective custody forms, and the security officer completed the necessary paperwork, which indicated, "Inmate is to be placed in P.C. for his own safety. Inmate wrote a statement on another Inmate. A copy of the statement has been passed around the facility posing a threat to Inmate Hartry's safety." (Norinsberg Decl., Ex. E.) The security officer then arranged to have Hartry moved out of the PODS area and into protective custody, which was located in the Administrative Segregation Section of the facility.

According to the record, it is at this juncture that Defendant Lundquist became involved with Hartry. At some point in the course of jail business, the security officer who transferred Hartry to protective custody discussed Hartry's situation with Lundquist. On September 20, after Hartry's first night in protective custody, Lundquist moved Hartry into a "day area" on the other side of the protective custody unit. "Day areas" are open spaces located in front of inmate cells in which the jail has placed several bunks to address overcrowding. The inmates housed in day areas are not separated from each other by bars and have no restrictions on contact with one another, but are kept apart from the inmates housed in the cells behind the day area.

The same day he was moved to the day area, Hartry met with Detective Vince Daly, the lead detective in the homicide case in which Hartry was serving as a witness, to discuss concerns about his safety. Lundquist was also present at this meeting, and although he denies any involvement in the meeting itself, he admits that Daly did discuss concerns about Hartry's safety with him at the meeting. According to Lundquist, "[Daly] asked that we look out for [Hartry's] safety," and Lundquist responded that they would do so. (Lundquist Dep. 16:15–19.)

Approximately a week after this meeting, on September 28, 2007, Hartry became aware that inmates in the Administrative Segregation section of the jail knew he was an informant

when an inmate in the cells behind his day area got his attention and yelled, "I heard about you. I know what's good with you." (Hartry Dep. 114:8–9.) According to Hartry, he understood this to mean, "I know that you [are] snitching on this woman." (Hartry Dep. 114:10–11.) The inmate allegedly showed Hartry a plastic spoon that had been sharpened into a weapon and threatened to "get at him" when the inmate got out of his cell. (Hartry Dep. 114:13.) This was the last time Hartry was directly threatened (the "September 28th Threat").

Hartry immediately reported the September 28th Threat to a corrections officer and informed Lundquist that he had been threatened. In response to that report, security searched the belongings of both Hartry and the inmate who had threatened him, but found no weapon. Despite being unable to substantiate Hartry's claim that the inmate had displayed a weapon, security officers again moved Hartry, placing him in yet another area within the Administrative Segregation section. On October 2, 2007, Hartry was moved for a fifth time, again within the Administrative Segregation section of the facility, this time for administrative reasons having nothing to do with his safety concerns.

Although not directly threatened after the September 28th Threat, Hartry claims that inmates continued to confront him about "what they were hearing around the jail." (Hartry Dep. 124:13–15.) According to Hartry, because of the constant tension after his status as a cooperating witness became known, he frequently called Lundquist asking to be moved out of SCCF because he was not safe there. Although the timing of the calls is unclear, the parties agree that Hartry placed 10 to 20 calls to Lundquist in the six weeks leading up to Hartry's attack.

However, despite agreeing on the number of calls, the parties dispute their content. Hartry claims he told Lundquist that his life was in danger, that he needed to be moved and that

during the calls he asked, "what [was] going on with [him] being moved out of jail." (Hartry Dep. 145:21–24.) Hartry further alleges that during those calls Lundquist responded by saying that he would arrange for Hartry to be moved to the Nassau County Correctional Facility ("NCCF"). Specifically, Hartry asserts that Lundquist assured him, "We're going to get to Nassau." (Hartry Dep. 146:16.) Hartry claims that as a result of that assurance he did not file a grievance concerning the jail's efforts to protect him because he believed that efforts were underway to transfer him out of SCCF.

On October 24, 2007, twenty six days after the September 28th Threat, Hartry was attacked by fellow inmate Vincent Dalton while Hartry was at his bunk in the day area (the "October 24th Attack"). According to Hartry, Dalton came up behind him, made a comment about Hartry being a "snitch" and then tapped him on the shoulder. When Hartry turned around, Dalton hit him in the face with a sock stuffed with soap bars, flipped him to the ground and punched him repeatedly in the head. As a result, Hartry suffered injuries to his face and his left eye. Although the parties agree that Hartry was injured during the attack, there is a dispute as to the extent of those injuries. Hartry claims he suffered severe and permanent injuries including a left orbital fracture, double vision, permanent loss of sensation in his face and sinus area and displacement of several teeth.

After the October 24th Attack, Hartry was moved to the Observation Bay area of the jail, where inmates are under 24-hour surveillance by guards. The next day, on October 25, Lundquist prepared a Substitute Jail Order to move Hartry out of the SCCF. On the Order, Lundquist cited as the reason for the transfer that "[i]nmate Hartry wrote [a] statement against [another inmate]. Inmate Hartry will be testifying against [this other inmate] and this information [has] become well known throughout the jail. Hartry has been labeled a rat and has

received threats." (Norinsberg Decl., Ex. D.)  On October 26, 2007, as a result of the attack, Hartry was transferred to the NCCF.

On September 12, 2008, Hartry filed a complaint against Suffolk County, Sergeant Lundquist, Detective Daly and various unnamed employees of the SCCF asserting the following causes of action: (1) deprivation of federal rights under 42 U.S.C. § 1983; (2) deliberate indifference to the Plaintiff's constitutional rights under 42 U.S.C. § 1983 by failing to protect the Plaintiff from the October 24th Attack; (3) municipal liability of the County of Suffolk for deliberate indifference to the Plaintiff's safety, well-being, and constitutional rights; (4) negligence under New York state law for failing to exercise reasonable care in safeguarding and protecting the Plaintiff; and (5) negligence against the County of Suffolk under New York law in hiring, training, retaining and assigning officers at SCCF.

Hartry voluntarily dismissed the complaint against all of the Defendants except Suffolk County and Sergeant Lundquist.  The remaining Defendants now move for summary judgment to dismiss the complaint on the following grounds:  (1) the Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e et seq. ("PLRA"); (2) the complaint fails to state a claim under 42 USC § 1983; (3) Defendant Lundquist is entitled to qualified immunity; and (4) the complaint fails to state a negligence claim under New York state law.

## II. DISCUSSION

### A.  Legal Standard

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material"

within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the

suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an

issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits,

interrogatory answers, and depositions must be viewed in the light most favorable to the party

opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citing

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per

curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward

with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting

Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by

casting mere "metaphysical doubt" upon the evidence produced by the moving party.

Matsushita, 475 U.S. at 586. Summary judgment is appropriate when the moving party can

show that "little or no evidence may be found in support of the nonmoving party's case." Gallo

v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). With

this standard in mind, the Court begins its analysis with the Defendants' procedural argument.

## B. Whether the Plaintiff Failed to Exhaust Administrative Remedies as Required by the Prison Litigation Reform Act ("PLRA")

Congress enacted the PLRA in 1996 "in the wake of a sharp rise in prisoner litigation in

the federal courts." Woodford v. Ngo, 548 U.S. 81, 83, 126 S. Ct. 2378, 165 L. Ed. 2d 368

(2006) (internal citation omitted). In an effort to control the increase in such litigation, the

PLRA provides that an inmate may not bring an action under federal law "with respect to prison conditions…until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Macias v. Zenk, 495 F.3d 37, 40 (2d Cir. 2007). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002); see also Macias, 495 F.3d at 40. Because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance," Woodford, 548 U.S. at 95, inmates must both substantively and procedurally exhaust their claims within the prison grievance system before filing suit. Macias, 495 F.3d at 43. This means that inmates must "compl[y] with an agency's deadlines and other critical procedural rules" before they can file a claim in federal court. Woodford, 548 U.S. at 90.

The procedures for filing a grievance at the SCCF are set forth in the Inmate Handbook, which states in relevant part as follows:

> INMATE GRIEVANCE PROGRAM
>
> All inmates are entitled to file legitimate grievances and may do so without fear of punishment or reprisals. An inmate must file a grievance within (5) five days of the date of the act or occurrence giving rise to the grievance.
>
> INSTRUCTIONS FOR RESOLVING INMATE PROBLEMS AND FILING GRIEVANCES
>
> If you have a complaint or problem:
>
> (1) Attempt to get it resolved with the officer assigned to your particular housing unit.
>
> (2) If for some reason you and the officer are unable to reach an acceptable resolution, you may request and will receive a grievance form to fill out. . . .
>
> * * *

Your completed formal grievance will be investigated and you will receive a written determination from the Grievance Coordinator within 5 business days. You have two (2) days to provide additional information if required.

If you do not agree with the Grievance Coordinator's decision, you have 2 (two) business days to appeal the determination to the Chief Administrative Officer of the facility.

* * *

(8) If your appeal to the Chief Administrative Officer results in an unfavorable decision, you may appeal such determination to the State Commission of Correction within three (3) business days. . . .

* * *

THE FOLLOWING DECISIONS WILL NOT BE SUBJECT OF A GRIEVANCE AND THEREFORE MAY NOT BE APPEALED TO THE CHIEF ADMINISTRATIVE OFFICER OR THE CITIZENS POLICY AND COMPLAINT REVIEW COUNCIL

- Actual penalties and sanctions, and/or surcharges resulting from disciplinary hearings.

- Administrative segregation housing decisions.

- Issues that are outside the authority of the Chief Administrative Officer's control. However, the policies and procedures leading to those decisions may be the subject of a grievance.

- Complaints pertaining to an inmate other than the inmate actually filing the grievance.

(Suffolk County Defendants' Statement Pursuant to Rule 56.1, Supplement to Ex. I at 15–16 (hereinafter cited as "Inmate Handbook").) In addition, New York has established grievance procedures for county jail inmates. See 9 N.Y.C.R.R. § 7032.4.

According to the Defendants, the Plaintiff was required to file a grievance no later than five days after September 28, 2007, the day of the September 28th Threat, because this was the last time that measures were implemented for the purposes of protecting him from harm. However, the basis for Hartry's complaint in the instant action is that the Defendants exhibited deliberate indifference in failing to protect him from the October 24th Attack. The Plaintiff testified at his deposition that he thought that Lundquist was working to have him transferred to

the NCCF.  (Hartry Dep. 145:25–146:20.)  Consequently, the Plaintiff's grievance prior to the October 24th Attack—the grievance he allegedly expressed to Lundquist in the numerous phone calls—was that he feared for his safety based on the threats and statements of other inmates.  The Inmate Handbook specifically states that "[c]omplaints pertaining to an inmate other than the inmate actually filing the grievance" cannot be the subject of a grievance.  (Inmate Handbook at 16.);  See also Hill v. Tisch, No. 02-CV-3901, 2009 WL 3698380, at *5 (E.D.N.Y. Oct. 30, 2009) (holding that the SCCF policy does not permit grievances against other inmates, but that the plaintiff was not excused from his failure to exhaust because the "[p]laintiff allege[d] that his injuries resulted from the failure of the SCCF defendants to protect him . . . and there is nothing in the record to suggest that such complaints are not grievable").

The actual "act or occurrence" that gave rise to the instant cause of action is the October 24th Attack, and therefore the Plaintiff had five days after the October 24th Attack to file a grievance against Lundquist or any other officer for failing to protect him.  See Curry v. Fischer, No. 02-CV-4477, 2004 WL 766433, at *7 (S.D.N.Y. Apr. 12, 2004) ("But it is not enough to satisfy the PLRA's exhaustion requirement that some issue has been exhausted: there must be a connection between the administrative grievance and the matters raised in the federal court complaint"); see also; Toomer v. County of Nassau, 07-CV-01495, 2009 WL 1269946, at *7 (E.D.N.Y. May 5, 2009) ("Although plaintiff was not required to name every specific defendant in his grievance against whom he now brings this action . . . he was required by the NCCC grievance procedure to make a formal, or informal followed by formal, complaint of the prison officials' acts of which he now complains.") (internal citation omitted).

Hartry admits that he did not file a formal grievance at any point before or after the October 24th Attack and therefore failed to exhaust his administrative remedies.  However, as

discussed below, Hartry asserts that his failure to exhaust should be excused because: 1) there was no reason for him to file a grievance once he received his desired remedy of transfer to NCCF, and 2) even if he was required to file a grievance, the fact that he was transferred from the SCCF within two days of the attack constitutes "special circumstances" rendering the administrative remedy unavailable.

### 1. Legal Standard for Excusing Failure to Exhaust Administrative Remedies

In Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004), the Second Circuit held that when a plaintiff has failed to exhaust his administrative remedies, the case can still proceed if the plaintiff can show that his failure to exhaust was due to one of the following three scenarios: (1) administrative remedies were unavailable to the prisoner; (2) the Defendants have either waived the defense or acted in such a way as to estop them from raising it; or (3) special circumstances exist that justify the prisoner's failure to comply with the requirement. A plaintiff's failure to exhaust administrative remedies as required by the PLRA is an affirmative defense that defendants must raise. Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004). Once properly raised, any alleged justification offered by a plaintiff is credited if a "similarly situated individual of ordinary firmness would have been deterred from following regular procedures." Hemphill, 380 F.3d at 690.

Although there was some question as to whether exhaustion could be "excused" after the Supreme Court held that procedural exhaustion was mandatory in Woodford v. Ngo, the Second Circuit has continued to apply the three Hemphill factors, and required district courts to do the same. See Macias v. Zenk, 495 F.3d 37 (2d Cir. 2007); Toomer v. Cnty. of Nassau, No. 07-CV-1495, 2009 U.S. Dist. LEXIS 38160 at *25 n. 8 (E.D.N.Y. May 5, 2009) (collecting cases); Hamid v. Temple, No. 05-CV-1358, 2009 WL 499139, at *5 (N.D.N.Y. Aug. 19, 2008).

## 2. Whether Administrative Remedies were Available to the Plaintiff

The first factor of the Hemphill analysis requires courts to look to whether the administrative remedy was actually "available" to the inmate. Hemphill, 380 F.3d at 686 . "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.'" Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (quoting Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)). Here, the Plaintiff asserts that the Court should consider the administrative remedy "unavailable" because the remedy he sought was transfer to NCCF, and therefore there was no other "relief" he could have received from the grievance procedure.

However, the Second Circuit has stated that where a plaintiff receives the remedy he would have otherwise sought through the grievance procedure—in this case the transfer to NCCF—the plaintiff must still exhaust the formal administrative procedures. See Ruggiero v. City of Orange, 467 F.3d 170, 177 (2d Cir.2006) (holding that, even where transfer was the remedy sought by the plaintiff, where additional remedies existed for the plaintiff's grievance, transfer to the other facility "did not render all administrative remedies unavailable"); Braham v. Clancy, 425 F.3d 177 (2d Cir. 2005), overruled on other grounds by Woodford v. Ngo, 548 U.S. 81, 83, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (holding that even after the plaintiff was transferred to another cell after he was attacked by his cellmate, the possibility of relief still existed because the prison "could have pursued the remedial measures . . . including '[d]evelop[ing] . . . policies and procedures pertaining to the grievance" or disciplining the relevant officers") (quoting Booth, 532 U.S. at 738–39, 121 S. Ct. 1819)).

As the Second Circuit explained in Ruggiero, the rationale for this rule is that the purpose of the PLRA is not simply to provide an inmate with a personal remedy, but also to: (1) provide

prison officials "the first opportunity to address [a] prisoner' complaint[]" which could lead to corrective action and improvements to prison administration, and (2) "for those cases that do find their way into the courts . . . [to] facilitate adjudication by ensuring a fully-developed administrative record."  467 F.3d at 178.  Thus, even where the inmate receives the desired remedy and is "no longer interested in the results that pursuing his claim through [the] grievance procedure would have yielded, the larger interests at stake under the PLRA [are] at issue, and thus exhaustion [is] required."  Id.; Rodriguez v. Senkowski, 103 F. Supp. 2d 131, 134 (N.D.N.Y. 2000) (holding that there was no reason an inmate could not initiate a grievance in the original facility after transfer because "[g]iven that the relief sought has punitive and procedural value beyond the well-being of the Plaintiff himself, the fact that he is no longer in the same facility may be irrelevant for purposes of exhaustion").  Therefore the fact that the Plaintiff received the desired remedy of transfer to NCCF following the October 24th Attack does not excuse his failure to exhaust his administrative remedies.

### 3.  Whether Defendants Are Estopped from Asserting the Exhaustion Defense

The focus of the second exception established in Hemphill is "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (citations omitted).  Hartry does not claim that any officers made any statements to him directly following the attack or once he was transferred to the NCCF that would have prevented him from filing a grievance.  Thus, the Plaintiff cannot assert that the Defendants were estopped from raising the exhaustion defense.

The parties do make a number of arguments regarding whether the Defendants should be estopped from asserting the exhaustion defense if the Court were to find that the Plaintiff was required to file a formal grievance no later than five days after the September 28th Threat. However, as discussed above, the Court finds that the operative date for the Plaintiff to have filed the grievance relating to the instant action was the day of the October 24th Attack., and therefore does not address these arguments.

### 4. Whether Special Circumstances Exist to Excuse the Plaintiff's Failure to Exhaust

The final factor to consider under the <u>Hemphill</u> analysis focuses on whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. <u>Hemphill</u>, 380 F.3d at 689; <u>see</u> <u>also</u> <u>Giano v. Goord</u>, 380 F.3d 670, 676–77 (2d Cir. 2004). Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute cannot be grieved. <u>Id.</u> Here, the Plaintiff claims that because he was no longer an inmate at the SCCF after the October 24th Attack, his transfer to NCCF constitutes a "special circumstance" in that he could not file a grievance at a facility where he was no longer an inmate.

Although the Second Circuit has explicitly stated that inmates who seek the remedy of transfer, and then receive that remedy, are still required to file a formal grievance, courts have been less clear as to whether the administrative remedy is still "available" when an inmate is transferred <u>before</u> they have a meaningful opportunity to avail themselves of the grievance process. The majority of the cases on this issue are distinguishable from the case at hand.

For example, many courts have found that where a plaintiff had an opportunity to meaningfully pursue the grievance while incarcerated at the facility where the grievance arose, the failure to exhaust those remedies was not excused by the plaintiff's transfer to a different facility. The rationale for not granting an exception to administrative exhaustion in these cases was that a plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred. Santiago v. Meinsen, 89 F. Supp. 2d 435, 441 (S.D.N.Y. 2000); Hargrove v. Riley, No. CV-04-4587, 2007 WL 389003, at *9 (E.D.N.Y. Jan. 31, 2007) ("Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. . . . [because] Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF."); Miles v. Cnty. of Broome, No. 04-CV-1147, 2006 WL 561247, at *6 (N.D.N.Y. March 6, 2006) ("Plaintiff was not transferred out of the BCCF until after he had the opportunity to file a grievance. Because Plaintiff did not timely file a grievance before his transfer and he had the opportunity to do so, he failed to exhaust his administrative remedies."); Burns v. Moore, No. 99-CV-0966, 2002 WL 91607, at *6 (S.D.N.Y. Jan. 24, 2002) (holding exhaustion requirement was not excused where plaintiff was transferred two months after claim arose); but see Rodriguez v. Senkowski, 103 F. Supp. 2d 131, 134 (N.D.N.Y. 2000) (holding that there was no reason an inmate could not initiate a grievance in the original facility after transfer because "[g]iven that the relief sought has punitive and procedural value beyond the well-being of the Plaintiff himself, the fact that he is no longer in the same facility may be irrelevant for purposes of exhaustion.").

The Court finds that this analysis is inapplicable to the instant case. Given that the grievance procedure in the Inmate Handbook permits an inmate five days to file the grievance,

and the Plaintiff was transferred to NCCF within two days of the October 24th Attack, the Court finds that the Plaintiff did not have a meaningful opportunity to pursue the administrative remedy while still at the SCCF.  This is consistent with the view expressed by other courts, including the Second Circuit, that an administrative remedy may properly be considered "unavailable" if the act or occurrence that gives rise to the claim occurs shortly before the inmate is transferred.  See, e.g., Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004) ("We have no occasion to consider the exhaustion requirement in situations where only a brief interval elapses between the episode giving rise to the prisoner's complaint and the prisoner's transfer to the custody of another jurisdiction."); Corye v. Carr, 9:08-CV-46, 2010 WL 396363, at *8 (N.D.N.Y. Jan. 26, 2010) ("Although the grievance mechanism was clearly 'available' in a technical sense, if plaintiff believed that he had given his grievance to an officer, and plaintiff was waiting for an answer, it is unclear when he would have realized that an answer was not forthcoming. It appears that plaintiff was transferred to Downstate after March 26, 2007, but before April 29, 2007.); Burns, 2002 WL 91607, at *6 ("This Court can imagine a situation where a prisoner could plausibly argue that he was effectively denied access to an administrative remedy because he could not file a grievance  . . . after he was transferred from the facility in which his complaint arose. For example, if an inmate's injury were to arise shortly before he was transferred from the facility, it might be impossible or extremely difficult for him to file a grievance prior to his transfer."); Muller v. Stinson, No. 99-CV-0624, 2000 WL 1466095, at *2 (N.D.N.Y. Sept. 25, 2000) ("If, in fact, Plaintiff was not transferred until after a grievance could have been filed and processed, then his claim must be dismissed for failure to exhaust administrative remedies. On the other hand, if he did not have an opportunity to avail himself of the grievance procedure because of his transfer, then he is not required to exhaust his administrative remedies.").

On the other hand, there are some courts that have found that transfer within correctional facilities governed by the same governmental agency will not excuse exhaustion, regardless of whether the inmate had an opportunity to pursue the remedy while at the facility where the claim arose.  See, e.g., Carini v. Austin, No. 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008); Finger v. Superintendent McFinnis, No. 99-CV-9870, 2004 WL 1367506, at *1 (S.D.N.Y. June 16, 2004); Sims v. Blot, No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility).  However, these cases are distinguishable insofar as they involved inmates that were transferred from one New York State-run facility to another.  Unlike the New York County-run facilities, inmates at the New York State-run facilities all follow the same grievance procedure referred to as the Inmate Grievance Program, which is outlined in 7 N.Y. C.R.R. 701(et. seq.).  Thus, in cases where an inmate is transferred from one state-run facility to another, the fact that the inmate may not have had time to file the claim while at the facility where the claim arose is not relevant because, "the grievance process is governed by a single set of regulations applicable to all state correctional facilities" and therefore "an inmate has the means to follow the process regardless of which state facility houses him."  Key v. Toussaint, 660 F. Supp. 2d 518, 524 (S.D.N.Y. 2009); see 7 N.Y. C.R.R. 701(et. seq.).

Conversely, New York County-run facilities, such as the SCCF and NCCF, are governed by 9 N.Y.C.R.R. 7032.4, which provides that "[i]nstructions for filing a grievance shall be included in the facility rules and information."  9 N.Y.C.R.R. 7032.4(b).  Thus, at New York County-run facilities, the grievance procedure for inmates to follow is specific to that particular facility.  At the SCCF, the Inmate Handbook states that the purpose of the Inmate Handbook is to "inform [the inmates] of the rules and procedures governing this facility."  (Inmate Handbook at

3 (emphasis added).)  There is no indication, either in the governing law or the Inmate

Handbook, that the Plaintiff was required to file a grievance at the SCCF from the NCCF, and

there is certainly nothing in the record to indicate that an uncounselled prisoner would be aware

if this was indeed a requirement.

Therefore, based on the fact that the Plaintiff was transferred less than two days after the

October 24th Attack, and that the Inmate Handbook specifically states that the grievance

procedure applies to inmates at the SCCF, the Court finds that Plaintiff is excused from

exhausting the administrative remedies and may proceed to trial on the federal claims.

## C. Whether there is a Material Dispute of Fact Regarding the Plaintiff's Section 1983 Claim

The Plaintiff brings this action pursuant to 42 USC § 1983 ("section 1983") claiming that

he faced a substantial risk of harm based on his known status as a cooperating witness, and that

the Defendants were aware of this risk and failed to take reasonable measures to protect him in

violation of his Constitutional rights.

"The Eighth Amendment requires prison officials to take reasonable measures to

guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corrs., 84

F.3d 614, 620 (2d Cir. 1996).  "[A]n inmate's claim that prison officials failed, as a result of their

deliberate indifference, to protect him from the violent actions of other inmates may state a

viable § 1983 cause of action."  Hendricks v. Coughlin, 942 F.2d 109, 113 (2d Cir. 1991);

Walker v. Shaw, 2010 WL 2541711, at *9 (S.D.N.Y. June 23, 2010) ("[W]hen a prisoner is

subjected to specific threats from another inmate, and there are 'indication[s] that the threat will

be carried out,' the failure of prison officials to act may give rise to a deliberate indifference

claim.") (quoting Green v. City of N.Y. Dep't of Corr., No. 06 Civ. 4978, 2008 WL 2485402, at

*6-7 (S.D.N.Y. June 19, 2008)).

However, mere negligence on the part of state officials is not sufficient to implicate a prisoner's constitutional rights. Morales v. New York State Dep't of Corrs., 842 F.2d 27, 28 (2d Cir. 1988). "The law is settled that a prisoner cannot base a federal civil rights action brought under 42 U.S.C. § 1983 on claims of a negligent failure of state prison officials to protect him from injury at the hands of another inmate." Id. In the Second Circuit, liability can only attach for "a state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." Id. at 30.

The Court applies a two-fold test for determining deliberate indifference: "First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the Defendant prison officials possessed sufficient culpable intent." Hayes, 84 F.3d at 620. Another two-tiered inquiry is used to analyze culpable intent. "Specifically, a prison official has sufficient culpable intent if [(1)] he has knowledge that an inmate faces a substantial risk of serious harm and [(2)] he disregards that risk by failing to take reasonable measures to abate the harm." Id.

The Defendants argue that the Plaintiff fails to establish either of the two prongs necessary to prove they had culpable intent, and therefore cannot prove deliberate indifference to sustain his section 1983 claim. As discussed below, the Court finds that there are material issues of fact both as to the objective question of whether the Plaintiff faced a substantial risk of harm, and the subjective question of the Defendants' knowledge of that harm.

**1. As to Whether the Plaintiff Faced a Substantial Risk of Serious Harm**

The first prong of the deliberate indifference analysis looks to whether the Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. Here, the Defendants argue that each time they moved the Plaintiff in response to threats, any substantial risk of harm

he may have faced was abated. In particular, the Defendants cite the 26-day period between the September 28th Threat and October 24th Attack, and argue that the fact there were no direct threats during this period indicates that there was no substantial risk of harm to the Plaintiff.

However, a substantial risk of harm can exist for purposes of deliberate indifference, regardless of whether a direct threat or attack actually occurs. For example, in Walker v. Shaw, No. 08-CV-10043, 2010 WL 2541711, at *9 (S.D.N.Y. June 23, 2010), the court held that the prison officials' failure to relocate the plaintiff created a substantial risk of harm where: 1) other inmates believed that the plaintiff was a member of the Bloods gang; 2) there had been "a violent history between the Bloods and Crips [that] caused at least one inmate to be killed while placed in the opposing gang's housing area"; and 3) the jail had a "policy of separating rival gang members." Cf. Swift v. Tweddell, 582 F.Supp.2d 437, 447 (W.D.N.Y. 2008) (dismissing a deliberate indifference claim because "it [was] clear that once defendants became aware of a possible risk to plaintiff's safety, they took prompt steps to avoid any problems or future incidents [and] [i]t [was] also clear that plaintiff never was harmed, or placed in imminent danger, as a result of anything that defendants did or failed to do"). In determining whether a substantial risk of harm existed, the Court should not "assess a prison official's actions based on hindsight" but rather should look at the "facts and circumstances of which the official was aware at the time he acted or failed to act." Heisler v. Kralik, 981 F. Supp. 830, 836 (S.D.N.Y. 1997).

Here, the Plaintiff has not only offered evidence of the dangers faced by inmates who are cooperating witnesses generally, but has also submitted evidence that he specifically was the target of threats for being a cooperating witness. Although the Defendants argue that the harm was abated each time they moved the Plaintiff, these prior threats are evidence that the Plaintiff potentially faced a risk of harm whenever inmates learned of his status. "[W]hen a prisoner is

subjected to specific threats from another inmate, and there are 'indication[s] that the threat will be carried out,' the failure of prison officials to act may give rise to a deliberate indifference claim." Walker, 2010 WL 2541711, at *9 (quoting Green v. City of N.Y. Dep't of Corrs., No. 06-CV-4978, 2008 WL 2485402, at *6–7 (S.D.N.Y. June 19, 2008)).

Furthermore, the Plaintiff testified at his deposition that during this 26-day period other inmates continued to question him about being a "rat" and he continued to call Lundquist to express concerns for his own safety. Given that on other occasions when inmates had learned this information the Plaintiff allegedly received death threats, the fact that inmates in his then current cell block were aware of his status placed him in similar danger. Whether the Plaintiff's testimony that inmates in his then current cell block had identified him as a cooperating witness is credible, and whether in this particular case the Plaintiff's known status as a cooperating witness would have created a substantial risk of serious harm, is a triable issue of fact. Hayes, 84 F.3d at 619 ("In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury.") (internal citations omitted).

In addition, the Plaintiff has also provided evidence of the general threat to inmates who are cooperating witnesses. For example, at his deposition, Lundquist made the following statements about the risk faced by cooperating witnesses:

> Q. If you had learned that Kyle Hartry's statement had been circulated amongst the inmates at Riverhead, would that have raised any concern about his safety in your mind?
>
> A. Yes.
>
> Q. Why would that have raised concern about his safety?
>
> A. Because fear of retribution.
>
> Q. When you say retribution, can you be more specific?
>
> A. He would or could become a target.

Q. Why would writing a statement out describing a homicide, why would that make Kyle Hartry a target at Riverhead?

. . .

A. Because you are not suppose to testify against another inmate.

(Lundquist Dep. 31:13–32:8.) Furthermore, the Plaintiff produced an article in which Lundquist was quoted as saying about the jail, "The worst thing you can be here is a snitch, so we have to protect people's identities." (See, Timothy Bolger, <u>Locked Up Landing Behind Bars Can Make or Break a Gang Banger</u>, Long Island Press, September 24, 2009; Norinsberg Decl. Ex. C.) Thus, by Lundquist's own statement, it is possible for an inmate to face a substantial risk of serious harm simply by being identified as an informant, regardless of whether other inmates are making direct threats. Based on this evidence, a jury could find that the "threat of harm" faced by the Plaintiff was "real and significant," so that the failure to relocate the Plaintiff created a substantial risk of serious harm. <u>Walker</u>, 2010 WL 2541711, at *9.

**2. As to Whether the Defendants Had Culpable Intent**

The Defendants contend that even if the Court finds that a substantial risk of serious harm existed, the Court should still grant summary judgment because the Defendants were not aware of this risk, and even if they were, the Defendants took reasonable protective measures to prevent the injury.

To establish culpable intent, the Plaintiff must show more than mere negligence, meaning that the Defendants were actually aware of the risk, not that they merely should have been aware of the risk. <u>Hayes</u>, 84 F.3d at 620. "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 186 (2d Cir. 2002) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 842, 114 S. Ct.

1970 (1994)).  "Prison officials may, of course, introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" <u>Salahuddin v. Goord</u>, 467 F.3d 263, 281 (2d Cir. 2006) (citing <u>Farmer</u>, 511 U.S. at 844, 114 S. Ct. 1970.). As the Second Circuit held in <u>Hayes</u>, it is not necessary for defendants to have knowledge of threats by specific individuals in order to find that defendants were deliberately indifferent to the safety of an inmate threatened with violence from other inmates.  84 F.3d at 621.

Here, for the purposes of overcoming summary judgment, the Plaintiff has cited enough evidence to create a triable issue of fact as to whether Lundquist was aware of the substantial risk of harm.  For example, at numerous points during his deposition, Lundquist acknowledged that he was aware that the Plaintiff faced threats when other inmates became aware of his status as a cooperating witness.  Lundquist acknowledged that he participated in a meeting with Detective Daly where Detective Daly asked Lundquist to "look out for [Hartry's] safety" and that Detective Daly was concerned because "[Hartry] was a cooperating witness." (Lundquist 16:6–24.)  Lundquist testified that he knew about the September 28th Threat and had been involved in responding to the threat by searching Hartry and the other inmates cells and having Hartry moved.  (Lundquist Dep. 147:13–148:4.).  Finally, Lundquist testified that prior to the October 24th Attack, he knew that Hartry was a cooperating witness and that Hartry had been labeled a "rat" by other inmates, based on statements Hartry made to him and based on things he had heard from other inmates.  (Lundquist 75:2–77:14.)  Given the evidence that Lundquist allegedly knew about the risk facing the Plaintiff, and the risks facing informants generally, a jury could find that Lundquist was aware of a substantial risk to the Plaintiff's safety.  <u>Salahuddin</u>, 467 F.3d at 280 (holding that [t]he prison official "need not desire to cause such harm or be aware that such harm

will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices.").

The Defendants also claim that, assuming they had knowledge of a substantial risk of harm, they still are not culpable because they took adequate protective measures by moving the Plaintiff within the jail to abate the harm when other inmates directly threatened the Plaintiff. However, there is a genuine issue of fact as to whether moving an inmate only in response to a direct threat, within or outside of the jail, constitutes a reasonable protective measure. The record contains sufficient evidence to show that this is a judgment call upon which reasonable minds could differ. For example Lundquist testified at his deposition that officers make decisions about whether to transfer an inmate out of the jail following a death threat on a "[c]ase by case basis." (Lundquist Dep. 68:8–12.) In addition, Lundquist also testified that whether an inmate is moved out of the jail, rather than within the jail, depends on the "scope of the threat." (Lundquist Dep. 89:15–24.) Each time the Defendants moved the Plaintiff within the jail, inmates became aware of his status as a cooperating witness and he had to be moved. Even after the Plaintiff was signed in to protective custody, he was apparently threatened by another inmate with a weapon. Under these circumstances, where the Defendants were allegedly aware that other inmates who the Plaintiff had contact with had learned of his status as a cooperating witness, "it is difficult . . . to conclude that the defendants' protective measures were so significant as to be reasonable *as a matter of law.*" <u>Hayes</u>, 84 F.3d at 621 (emphasis in original).

Thus, the Court finds that the Plaintiff has raised a triable issue of fact as to whether the Defendants were deliberately indifferent to a substantial risk of harm to the Plaintiff based on his status as a cooperating witness in the SCCF. Accordingly, the motion to dismiss the § 1983 cause of action is denied.

**D. Whether Lundquist is Entitled to Qualified Immunity**

The Defendants next argue that even if there was a Constitutional violation, Defendant Lundquist is entitled to qualified immunity and so this Court must grant summary judgment in his favor. The Court initially notes that the Plaintiff's failure to address the issue of qualified immunity is not dispositive. When considering an unopposed motion for summary judgment, the Court still must ensure that the moving party has met its burden and is entitled to judgment as a matter of law. See Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); Banushi v. City of New York, 2010 WL 4065414, at *11 (E.D.N.Y. Oct. 15, 2010) (denying motion for summary judgment on qualified immunity defense despite the fact that the plaintiff failed to respond to the motion).

"Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007) (citing Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), and citing Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). If, on the undisputed facts, the officer's actions were objectively reasonable, the officer is entitled to qualified immunity and summary judgment dismissing the suit is appropriate. Id. at 87. "Putting it differently, a claim for qualified immunity will be defeated only if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." Malley v. Briggs, 475 U.S. 335, 349, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Therefore, if a reasonably well-trained officer in

Lundquist's position would have considered moving the Plaintiff within the jail—as was done after the September 28th Threat—an adequate means of ensuring the Plaintiff's safety despite the Plaintiff's continued concerns for his safety, then Lundquist is entitled to qualified immunity. See id. at 346.

Here, the Defendants' assert that Lundquist's actions were not "objectively unreasonable." However, the Defendants have not presented any evidence to establish that a reasonably well-trained officer would have decided not to transfer the Plaintiff out of the SCCF in the face of the numerous threats made against him and knowledge that he had been identified as a cooperating witness. As discussed in detail above, the Plaintiff was allegedly threatened each time an inmate learned of his status as a cooperating witness, and documentary evidence establishes that Defendants may have been aware of the threats and the reason for the threats.

According to Lundquist's deposition testimony, a Substitute Jail Order is completed to transfer an inmate out of the SCCF for safety reasons only when officials of the jail feel they cannot continue to safely house the threatened inmate. (Lundquist Dep. 66:17–24.) Requests for transfers are considered on a case-by-case basis, because many inmates are threatened and the facility cannot move all of them. (Lundquist Dep. 68:8–12.) Lundquist testified that he never considered moving Hartry until he was attacked by inmate Vincent Dalton on October 24, 2007. (Lundquist 70:18–21.) Making all inferences in favor of the non-moving party, the Court cannot conclude that based on the facts and evidence in the record, the Defendants actions were "objectively reasonable" as a matter of law. See Green v. City of New York, 465 F.3d 65, 83 (2d Cir. 2006) ("If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury.") (citing Kerman v. City of New York,

374 F.3d 93, 109 (2d Cir. 2004)). Therefore the Court must deny the Defendants' motion for summary judgment based on qualified immunity.

## E. Pendent State Law Claims

Finally, the Defendants ask this Court to grant summary judgment as to the Plaintiff's state-law negligence causes of action on two grounds. First, the Defendants argue that because the Plaintiff has failed to state a valid federal cause of action, this Court should decline to exercise pendent jurisdiction over both of the Plaintiff's state-law causes of action for negligence and negligent hiring, training, and retention of officers. Second, the Defendants contend that even if the federal law claim is valid, the Plaintiff has failed to state a viable negligence claim under New York law. The Court addresses, and rejects, each argument in turn.

The Defendants' procedural argument relies on the presumed dismissal of the Plaintiff's federal law causes of action to support the dismissal of the pendent state law causes of action. However, because this Court denies summary judgment to the Defendants as to the federal causes of action in this case, the procedural argument has no merit. This Court will exercise pendent jurisdiction over the Plaintiff's state-law negligence claim, as it arises from the same nucleus of operative facts as the Plaintiff's federal cause of action. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ("[A] federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'") (quoting Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966)).

In regard to the substance of the state law negligence claim, the Defendants seek dismissal on the ground that the Plaintiff has failed to sufficiently state a claim upon which relief can be granted.  A negligence claim will survive summary judgment when a plaintiff alleges facts that establish that the Defendant had a duty to protect the plaintiff, the Defendant breached that duty, and that breach caused the plaintiff to be injured.  See Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002).

The Defendants do not dispute that they owed the Plaintiff a duty, nor could they. "Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard inmates, even from attacks by fellow inmates."  Sanchez v. State of New York, 99 N.Y.2d 247, 253 (2002). However, the existence of this duty does not give rise to state liability every time an inmate is attacked by a fellow inmate.  The state is not expected to be an insurer of inmate safety.  Id. at 256.  Confining criminals together in tight quarters carries a certain amount of risk that the state can never eradicate.  Id.  Therefore, negligence claims in inmate assault cases turn on whether the assault in question was foreseeable.  The State breaches the duty of reasonable care owed to inmates only if "the assault was foreseeable, that is the State knew or had reason to know of an unreasonable risk of an inmate-on-inmate attack yet failed to take appropriate action to ameliorate the risk or to assist the inmate once the attack was underway."  Id. at 260.  The threshold the State must meet when seeking summary judgment on this issue is very high; "there must be only one conclusion that can be drawn from the undisputed facts – that as a matter of law injury to [the plaintiff] was not reasonably foreseeable."  Id. at 254.  The evidence in this case does not support such a holding.  The Plaintiff was threatened multiple times even while in

protective custody and there is evidence that the Defendants knew that the Plaintiff's status as a cooperating witness was known throughout the jail.

The Defendants claim that because the Plaintiff was not directly threatened for 26 days between the September 28th Threat and the attack, the Plaintiff's injury was not reasonably foreseeable. However, throughout that time the Plaintiff continued to be approached by inmates concerning what they were hearing around the jail, and he continued to call Defendant Lundquist and complain that he feared for his safety. Even without a direct threat, Lundquist knew that the Plaintiff had been labeled a "snitch" and that it was highly dangerous to be a snitch in the SCCF. Based on these facts, a jury could find that the Plaintiff's injury was reasonably foreseeable. Therefore, this Court denies the Defendants' summary judgment motion as to the Plaintiff's state-law negligence claim.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Defendants' motion for summary judgment dismissing the case pursuant to Fed R Civ P 56(c) is denied in its entirety, and it is further

**ORDERED**, that the Clerk of the Court is directed to amend the caption to reflect the removal of Detective Daly as a defendant and to include the correct spelling of Defendant Lundquist's name.

**SO ORDERED**.

Dated: Central Islip, New York
December 15, 2010

                        ___/s/ *Arthur D. Spatt*_____
                         ARTHUR D. SPATT
                        United States District Judge